UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| v. | ) CRIMINAL ACTION |
| | ) NO. 04-10372-WGY |
| GEORGE KANDIRAKIS, | ) |
| Defendant. | ) |

SENTENCING MEMORANDUM

YOUNG, D.J.                                                    August 1, 2006

**"What is overlooked in post-Booker discussions is the
fact that, for seventeen years, federal courts had been
sentencing offenders unconstitutionally."[1]**

For seventeen years federal courts had been sentencing
offenders unconstitutionally.  Think about that.  The human cost
is incalculable -- thousands of Americans languish in prison
under sentences that today are unconstitutional.  The
institutional costs are equally enormous -- for seventeen years
the American jury was disparaged and disregarded in derogation of
its constitutional function; a generation of federal trial judges
has lost track of certain core values of an independent judiciary
because they have been brought up in a sentencing system that
strips the words "burden of proof", "evidence", and "facts" of

---

[1]Professor Douglas Berman, Remarks at Harvard Black Letter
Law Association (Apr. 4, 2006).

genuine meaning[2]; and the vulnerability of our fair and impartial

federal trial court system to attack from the political branches

of our government has been exposed as never before in our

history.[3]

    Today, elements in the legislature, a monolithic executive,

and courts below the Supreme Court all seem to be acting in

concert to devise a sentencing system as close to

unconstitutionality as possible.[4]    This Court has charted a

_____

[2]See United States v. Green, 346 F. Supp. 2d 259, 280-82 (D.
Mass. 2004), rev'd 426 F.3d 64 (1st Cir. 2005); and rev'd sub
nom. United States v. Pacheco, 434 F.3d 106 (1st Cir. 2006);
United States v. Yeje-Cabrera, 430 F.3d 1 (1st Cir. 2005).

[3]See, e.g., United States v. Kirsch, 287 F. Supp. 2d 1005,
1006-07 (D. Minn. 2003) (Magnuson, J.) ("Congress and the
Attorney General have instituted policies designed to intimidate
and threaten judges into refusing to depart downward, and those
policies are working.  If the Court were to depart, the Assistant
U.S. Attorney would be required to report that departure to the
U.S. Attorney, who would in turn be required to report to the
Attorney General.  The Attorney General would then report the
departure to Congress, and Congress could call the undersigned to
testify and attempt to justify the departure.  This reporting
requirement system accomplishes its goal: the Court is
intimidated, and the Court is scared to depart.").

[4]See United States v. Navedo-Concepción, 450 F.3d 54, 60
(1st Cir. 2006) (Torruella, J., dissenting) ("I am concerned that
we are, like a glacier in the ice age, inch by slow inch,
regressing to the same sentencing posture we assumed before the
Supreme Court decided Booker.  . . .  [I do not] believe that
this is what the Supreme Court had in mind when it struck down
the mandatory Guidelines regime."); Judge Nancy Gertner, What
Yogi Berra Teaches about Post-Booker Sentencing, Yale L.J. (The
Pocket Part), July 2006, http://www.thepocketpart.org/2006/07/
gertner.html ("[W]ith each decision and report, the slide towards
'mandatoriness' has resumed.  The courts and the [Sentencing]
Commission are each walking the same path post-Booker as they had
pre-Booker.  . . .  [L]ock step 'compliance' with Guidelines
while intoning 'advisoriness'[] is not just bad policy or worse,

2

different course -- one that gives real meaning to the language of all the controlling decisions of the Supreme Court, yet scrupulously adheres to the rulings of that inferior court which controls the work of this one. It is a procedure that ensures significant protections for all litigants without added burden, wasted time, or cost to our system of justice.

This Sentencing Memorandum maps the legal landscape and explains the Court's procedures within it -- all in the context of a well-tried case which required this Court to work through the implications of its own practices.

## I.    The Prosecution -- Opening Moves

On December 15, 2004, a federal grand jury indicted Jess Siciliano ("Siciliano"), Michael Arco ("Arco"), and George Kandirakis ("Kandirakis") for conspiracy and possession, with intent to distribute, oxycodone -- known commonly by one of its trade names, OxyContin. The government charged that Siciliano was an OxyContin supplier and that Arco and Kandirakis were OxyContin retailers who got their illicit supplies from Siciliano. The government conceded that Kandirakis was the least

_____

hypocrisy; this time it will be unconstitutional."); see also Letter from Jon M. Sands, Federal Public Defender, to Hon. Ricardo Hinojosa, Chair, U.S. Sentencing Commission (July 19, 2006), Memorandum at 1 ("The Commission should not continue to recommend minimal constitutional protections."), available at http://sentencing.typepad.com/sentencing_law_and_policy/files/defender_letter_to_ussc_71906.pdf.

3

involved of the three. Siciliano and Arco quickly copped pleas.

The plea deals, proffered to the Court pursuant to Federal Rule

of Criminal Procedure 11(c)(1)(C)[5], would result in a 46-month

sentence for Siciliano and a 57-month sentence for Arco.[6]

---

[5]A Rule 11(c)(1)(C) plea bargain crowds a judge into a "take
it or leave it" position. It facilitates plea bargaining --
today, the functional goal of our criminal justice system, see
George Fisher, Plea Bargaining's Triumph, 109 Yale L.J. 857
(2000) -- by requiring a judge to "give back" a plea if she
imposes other than the sentence bargained for.

This, of course, adds a powerful, near-hydraulic pressure in
favor of plea bargaining. While it theoretically still guards
against extreme, sweetheart deals and monstrously draconian
agreements, such safeguards are practically nil. In twenty-one
years of service as a district judge, I have never refused such a
plea once proffered. (I can make this statement with confidence
since Donald Womack, the superb official court reporter assigned
to this session, see Miara v. First Allmerica Fin. Life Ins. Co.,
379 F. Supp. 2d 20, 69 n.57 (D. Mass. 2005), has provided to the
Court and to the public a fully searchable database of all this
Court's sentencing decisions at http://donwomack.com. See infra
note 76.)

The reasons for the parties seeking to cabin judicial
discretion are not hard to fathom. I have a deserved reputation
for sentencing severely. See, e.g., United States v. Berthoff,
140 F. Supp. 2d 50, 55 (D. Mass. 2001) (sentencing at the top of
the Guidelines range). At least, I did under the
unconstitutional "mandatory Guidelines" system. Siciliano and
Arco wished to avoid the risk of a sentence heavier than they
could bargain. Ever the superb institutional litigant, however,
the government as a repeat player, sensed (it probably keeps its
own records) that in the present "advisory Guidelines" system, I
am more likely than any of my colleagues in the District of
Massachusetts to sentence below the advisory range (but not by
much). U.S. Sentencing Commission, "Federal Sentencing
Statistical Report Prepared for the Hon. Mark L. Wolf, Chief
Judge" (2006) (providing individual district court judge and
circuit court statistics on length of sentences imposed and
Guidelines departure comparisons). The government naturally
wished to force a sentence as severe as it could bargain.

[6]The longer proposed sentence for the retailer Arco as
compared with the supplier Siciliano is explained by Arco's
lengthier criminal history.

The Court held an extensive plea colloquy with Siciliano and Arco, explaining the procedural protections it affords defendants who go to trial. See infra Part IV. From this colloquy, the Court concluded that both Siciliano and Arco had bargained down, for sentencing purposes, the quantity of OxyContin properly attributable to them, the government trading away provable facts in return for the certainty that comes from a plea.[7]  The First Circuit explicitly embraces such "fact bargaining", even when relevant data is hidden from the Court. See United States v. Yeje-Cabrera, 430 F.3d 1, 23-30 (1st Cir. 2005).  While this is the ugly truth on which many plea-bargained sentences rest, so sweeping is our plea bargaining culture today, that it is a staple of criminal practice in this circuit and district.[8]  Those who deny it[9] are sophists, engaging in what my colleague, Judge

_____

[7]In fairness to the government, it must be noted that during Kandirakis's sentencing hearing, the Court revised its view as to Arco, concluding that, in his case, the sentence imposed actually encompasses his relevant conduct.

[8]See, e.g., Yeje-Cabrera, 430 F.3d at 23-30; United States v. Thurston, 358 F.3d 51 (1st Cir. 2004); United States v. Rodriguez, 162 F.3d 135 (1st Cir. 1998); United States v. Bleidt, No. 05-10144 (D. Mass filed June 5, 2005), Plea Hr'g, Dec. 5, 2005 (aged and vulnerable nature of many victims omitted to secure plea); United States v. Fuller, No. 05-10082 (D. Mass. filed Mar. 24, 2005), Plea and Sentencing Hr'g, Nov. 16, 2005 (fraud loss amount understated to secure plea); United States v. Montilla, No. 04-10160 (D. Mass. filed May 20, 2004), Sentencing Hr'g, Oct. 18, 2005 (drug quantity understated to secure plea).

[9]See Amie N. Ely, Note, Prosecutorial Discretion as an Ethical Necessity: The Ashcroft Memorandum's Curtailment of the Prosecutor's Duty to "Seek Justice", 90 Cornell L. Rev. 237, 252-59 (2005) (describing the Department of Justice's purported

5

Douglas Woodlock, calls "a massive exercise in hypocrisy".
Berthoff, 140 F. Supp. 2d at 64.

Fearing the vindictive moral quagmire that the government
creates when it posits a more favorable, alternative factual
universe for those who will plead guilty, but then proves the
actual facts against those who go to trial, this Court
entertained Siciliano's and Arco's proffered pleas, but declined
to accept or reject them until Kandirakis had been tried and, if
necessary, sentenced.[10]

This done, the government and Kandirakis, gearing up for
trial, "set [their] faces to the stormy sea [and] bid the land
farewell."[11]

_____

charging and sentencing policies).

[10]It is clear that the First Circuit sees no vindictiveness
where the government is willing to hide facts from the Court if
there is to be a plea, but goes ahead and proves those facts if
the plea deal falls through and the defendant goes to trial.
Yeje-Cabrera, 430 F.3d at 23-30.  Such analysis binds this Court.
What remains unclear is whether that court discerns
vindictiveness when one defendant gets the advantage of an
imaginary universe of facts, and another, similarly situated
defendant does not.  But see United States v. Thurston, No. 05-
2271, -- F.3d --, 2006 WL 2065404, at *4-5 (1st Cir. July 26,
2006) (mandating a lengthy prison sentence for one defendant who
went to trial, but probation for a co-defendant who pled;
defendants were not similarly situated because one of them went
to trial; yet this rule does not "impose a burden on [the
defendant's] exercise of his constitutional right to a jury
trial").

[11]Tommy Makem, "Ballad of the Lady Jane", on Lonesome Waters
(Shanachie Records 1986).

6

A necessary part of that preparation, for both the Court and counsel, involved significant legal analysis.

## II. A "Muddled"[12] Legal Landscape: The Two Faces of Booker

Eighteen months ago the Supreme Court issued its decision in United States v. Booker. 543 U.S. 220 (2005). The case had promised to be the culmination of a reinvigoration in the criminal defendant's Sixth Amendment right to trial by jury, which the Court had begun several years before in Apprendi v. New Jersey. 530 U.S. 466 (2000).[13] In Apprendi, the Court held that, "[o]ther than the fact of a prior conviction[14], any fact

_____

[12]Douglas A. Berman, Perspectives and Principles for the Post-Booker World, 17 Fed. Sentencing Rep. 231, 231 (2005) ("[T]he Booker decision made a conceptually muddled constitutional jurisprudence of sentencing even more opaque.").

[13]The Court's decision in Apprendi had been foreshadowed the previous term in Jones v. United States, 526 U.S. 227 (1999), which construed a federal statute so as to avoid the constitutional question.

[14]This caveat was the remnant of the Court's decision in Almendarez-Torres v. United States. 523 U.S. 224 (1998). The five-Justice majority included Justice Thomas, who all but recanted his support for that decision in Apprendi. See 530 U.S. at 518-23 (Thomas, J., concurring). Since Apprendi, Justice Thomas has made only clearer his dissatisfaction with his vote in Almendarez-Torres. See Rangel-Reyes v. United States, 126 S. Ct. 2873, 2874-75 (2006) (Thomas, J, dissenting from denial of certiorari); Shepard v. United States, 544 U.S. 13, 27-28 (2005) (Thomas, J., concurring) ("Almendarez-Torres . . . has been eroded by this Court's subsequent Sixth Amendment jurisprudence, and a majority of the Court now recognizes that [it] was wrongly decided. The parties do not request it here, but in an appropriate case, this Court should consider Almendarez-Torres'[s] continuing viability. Innumerable criminal defendants have been unconstitutionally sentenced under the flawed rule . .

7

that increases the penalty for a crime beyond the prescribed

statutory maximum must be submitted to a jury, and proved beyond

a reasonable doubt."  Id. at 490.[15]

The consequences of Apprendi for the Federal Sentencing

Guidelines were immediately apparent.  See id. at 550-51

(O'Connor, J., dissenting).  Though the facts of Apprendi

involved legislatively enacted statutes, the constitutional rule

of that case seemed equally to apply to all judge-based,

determinate sentencing schemes.  This Court so held on June 18,

2004, in United States v. Green, 356 F. Supp. 2d 259 (D. Mass.

2004), which ruled the Guidelines unconstitutional.  Green's

reasoning was confirmed days later in Blakely v. Washington, 542

U.S. 296 (2004), which invalidated the State of Washington's

nearly identical sentencing apparatus.  Though the Supreme Court

officially reserved the question, id. at 305 n.9, after Blakely

it was quite obvious to many other observers that the Guidelines

were unconstitutional.  As soon as "the [Supreme] Court could get

_____

. ." (citations omitted)).  The issue not having been revisited
by the Court, however, it is still "good law".  See Booker, 543
U.S. at 244.

    But see Rangel-Reyes, 126 S. Ct. at 2873 (Stevens, J.)
("While I continue to believe that Amendarez-Torres v. United
States, 523 U.S. 224 (1998), was wrongly decided, that is not
sufficient reason for revisiting the issue.").

[15]Apprendi is fast becoming one of the most-cited Supreme
Court cases ever.  See Adam N. Steinman, The Irrepressible Myth
of Cylotex: Reconsidering Summary Judgment Burdens Twenty Years
after the Trilogy, 63 Wash. & Lee L. Rev. 81, 144-45 (2006)
(showing Apprendi as the 24th most-cited case by all courts,
despite being only 6 years old).

before it a case properly presenting the constitutionality of the
mandatory [federal] Guidelines", they likewise were invalidated.
Booker, 543 U.S. at 313 (Scalia, J., dissenting in part).

Booker could have been the simple, logical extension of the
Supreme Court's Apprendi jurisprudence.  Instead, the Court
produced a fractured, 124-page decision with two majority
opinions and four dissents.  What remained after the verbal
cannonades was this:

- One majority opinion ("Constitutional Booker") which
  ruled that the Guidelines violated the Sixth Amendment.
  This opinion was written by Justice Stevens and joined
  by Justices Scalia, Souter, Thomas, and Ginsburg.

- Another majority opinion ("Remedial Booker") which
  ruled that the way to rectify the constitutional
  infirmity was to make the Guidelines advisory rather
  than mandatory.  This opinion was written by Justice
  Breyer and joined by Chief Justice Rehnquist and
  Justices O'Connor, Kennedy, and Ginsburg.

How logically to implement these two majority opinions has been a
question with which the lower federal courts have been grappling
ever since.

### A.  Constitutional Booker

The constitutional decision in Booker is quite succinct.  A
review of the Court's Sixth Amendment jurisprudence -- especially
its Blakely decision -- yielded but one conclusion: "[T]here is
no distinction of constitutional significance between the Federal
Sentencing Guidelines and the Washington procedures at issue in

9

that case." Booker, 543 U.S. at 233. As quoted above, the rule set forth in Apprendi is that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. As further explicated in Blakely, "the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." 542 U.S. at 303-04.

The mandatory nature of the Guidelines was crucial. "If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment. . . . Indeed, everyone agrees that the constitutional issues presented by these cases would have been avoided entirely if Congress had omitted from the [Sentencing Reform Act of 1984] the provisions that make the Guidelines binding on district judges . . . ." Booker, 543 U.S. at 233. Therefore, after rejecting stare decisis and separation of powers arguments, the Court "reaffirmed [its] holding in Apprendi" and declared the Guidelines unconstitutional. Id. at 239-43, 244.

10

## B.    Remedial Booker

The second majority seized on the mandatory nature of the
Guidelines in remedying their unconstitutionality.  Booker, 543
U.S. at 244-71.  Consequently, rather than grafting the Sixth
Amendment's jury right onto the Guidelines (the solution
preferred by the Justices of Constitutional Booker, minus Justice
Ginsburg) or discarding the Guidelines altogether (a solution no
Justice supported), Remedial Booker papered over the Guidelines'
Sixth Amendment infirmity by "sever[ing] and excis[ing]" two
sections of Title 18 that made the Guidelines mandatory for
sentencing[16] and

_____

[16]Title 18, Section 3553 provides in relevant part:

(a) Factors to be considered in imposing sentence.--
The court shall impose a sentence sufficient, but not
greater than necessary, to comply with the purposes set
forth in paragraph (2) of this subsection.  The court,
in determining the particular sentence to be imposed,
shall consider--
     (1) the nature and circumstances of the offense
     and the history and characteristics of the
     defendant;
     (2) the need for the sentence imposed--
          (A) to reflect the seriousness of the
          offense, to promote respect for the law, and
          to provide just punishment for the offense;
          (B) to afford adequate deterrence to criminal
          conduct;
          (C) to protect the public from further crimes
          of the defendant; and
          (D) to provide the defendant with needed
          educational or vocational training, medical
          care, or other correctional treatment in the
          most effective manner;
     (3) the kinds of sentences available;
     (4) the kinds of sentence and the sentencing range
     established for--

11

appellate[17] courts.  Id. at 245, 249.  Doing so made the

> (A) the applicable category of offense
> committed by the applicable category of
> defendants as set forth in the guidelines
> issued by the Sentencing Commission pursuant
> to section 994(A)(1) of title 28, United
> States Code, and that are in effect on the
> date the defendant is sentenced; . . .
>
> (5) any pertinent policy statement issued by the
> Sentencing Commission pursuant to section
> 994(a)(2) that is in effect on the date the
> defendant is sentenced;
>
> (6) the need to avoid unwarranted sentence
> disparities among defendants with similar records
> who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims
> of the offense.
>
> (b) Application of guidelines in imposing a sentence.--
> (1) In general. Except as provided in paragraph (2),
> the court shall impose a sentence of the kind, and
> within the range, referred to in subsection (a)(4)
> unless the court finds that there exists an aggravating
> or mitigating circumstance of a kind, or to a degree,
> not adequately taken into consideration by the
> Sentencing Commission in formulating the guidelines
> that should result in a sentence different from that
> described. . . . .

[17]Title 18, Section 3742(e) provides:

Consideration.-- Upon review of the record, the court
of appeals shall determine whether the sentence--
> (1) was imposed in violation of the law;
> (2) was imposed as a result of an incorrect
> application of the sentencing guidelines;
> (3) is outside the applicable guideline range, and
>     (A) the district court failed to provide the
>     written statement of reasons required by
>     section 3553(c);
>     (B) the sentence departs from the applicable
>     guideline range based on a factor that--
>         (i) does not advance the objectives set
>         forth in section 3553(a)(2); or
>         (ii) is not authorized under section
>         3553(b); or
>         (iii) is not justified by the facts of
>         the case; or

Guidelines "effectively advisory". Id. at 245.

Section 3553(b)(1) of the U.S. Code required the district court to impose a sentence "of the kind[] and within the range" set forth in the Guidelines. Striking this Section, the Court ruled that what remained still "requires judges to take account of the Guidelines together with other sentencing goals." Id. at 259 (citing 18 U.S.C. § 3553(a)). Thus, "[t]he district courts, while not bound by the Guidelines, must consult those Guidelines and take them into account when sentencing." Id. at 264. "It requires a sentencing court to consider the Guidelines ranges, but it permits the court to tailor the sentence in light of other statutory concerns as well." Id. at 245-46 (citations omitted).

---

> (C) the sentence departs to an unreasonable
> degree from the applicable guidelines range,
> having regard for the factors to be
> considered in imposing a sentence, as set
> forth in section 3553(a) of this title and
> the reasons for the imposition of the
> particular sentence, as stated by the
> district court pursuant to the provisions of
> section 3553(c); or
>
> (4) was imposed for an offense for which there is
> no applicable sentencing guideline and is plainly
> unreasonable.
>
> The court of appeals shall give due regard to the
> opportunity of the district court to judge the
> credibility of the witnesses, and shall accept the
> findings of fact of the district court unless they are
> clearly erroneous and, except with respect to
> determinations under subsection (3)(A) or (3)(B), shall
> give due deference to the district court's application
> of the guidelines to the facts. With respect to
> determinations under subsection (3)(A) or (3)(B), the
> court of appeals shall review de novo the district
> court's application of the guidelines to the facts.

13

Further, the Court struck Section 3742(e). Id. at 260-67.
That Section had given the Circuit Courts of Appeals de novo
review of sentences falling outside the prescribed Guidelines
range. See 18 U.S.C. § 3742(e)(3)(B)(ii). In its place, the
Court established a standard of "reasonableness". Stating that
the appellate courts were "already familiar" with the standard
from "the past two decades of appellate practice in cases
involving departures", the Court said that circuit courts should
look to the factors set forth in Section 3553(a) to guide them,
"as they have in the past". Booker, 543 U.S. at 261.
Disclaiming Justice Scalia's "belief that use of a reasonableness
standard '[would] produce a discordant symphony' leading to
'excessive sentencing disparities,' and 'wreak havoc' on the
judicial system", the Remedial Booker majority concluded that, as
the Sentencing Commission "continue[s] to modify its Guidelines",
it would "encourag[e] what it finds to be better sentencing
practices." Id. at 263. This tack would "thereby promote
uniformity in the sentencing process", id., and allow circuit
courts to "iron out sentencing differences", id. at 263.

## C.    Contradictions

### "The Federal Sentencing Guidelines are dead.
### Long live the Federal Sentencing Guidelines."[18]

As Judge Michael W. McConnell of the Tenth Circuit has
noted, the two Booker opinions, "taken in tandem, do not get high
marks for consistency or coherence. . . . The most striking
feature of the Booker decision is that the remedy bears no
logical relation to the constitutional violation." Michael W.
McConnell, The Booker Mess, 83 Denver U. L. Rev. 665, 677
(2006).[19] The constitutional violation of the Guidelines was
that judges, rather than juries, found the facts necessary for
sentencing. Instead of focusing the remedy on who performed the
fact-finding, however, Remedial Booker honed in on the
"necessity" of the facts. It purported to make those facts
"unnecessary" by making the Guidelines "effectively advisory".
As a result, "[t]he jury verdict is no more consequential after

---

[18]Edward Lazarus, "The Supreme Court's Sentencing Guidelines
Decision: Its Logic, and Its Surprisingly Limited Practical
Effect", Jan. 21, 2005, at http://writ.news.findlaw.com/lazarus/
20050121.html.

[19]See also United States v. Cage, 451 F.3d 585, 591-94 (10th
Cir. 2006); Frank O. Bowman, Beyond Band-Aids: A Proposal for
Reconfiguring Federal Sentencing After Booker, 2005 U. Chi. Legal
F. 149, 182 ("[One] mystery about the Booker remedial opinion is
how it can possibly be squared with either the announced black-
letter rule or the underlying theory of the Blakely opinion it
purports to apply."); David J. D'Addio, Sentencing After Booker:
The Impact of Appellate Review on Defendants' Rights, 24 Yale L.
& Pol'y Rev. 173, 174 (2006) ("How these two majority opinions
fit together remains a puzzle, in part because of an inherent
contradiction in Justice Breyer's remedial opinion.").

15

Booker than it was before". McConnell, supra, at 677. "All the things that troubled Sixth Amendment purists about the pre-Booker Guidelines system are unchanged", including reliance on uncharged and even acquitted conduct. Id.; see Booker, 543 U.S. at 302 (Stevens, J., dissenting in part) ("[T]he Court [in Remedial Booker] has effectively eliminated the very constitutional right Apprendi sought to vindicate.").

The way in which most circuit courts have decided to review the countless criminal sentences issued under the pre-Booker, mandatory Guidelines system illustrates this contradiction well. The First Circuit[20] confronted the question in United States v. Antonakopoulos. 399 F.3d 68 (1st Cir. 2005). The court first framed the issue: "The [Booker] error is not that a judge (by a preponderance of the evidence) determined facts under the Guidelines which increased a sentence beyond that authorized by the jury verdict or an admission by the defendant; the error is only that the judge did so in a mandatory Guidelines system." Id. at 75. Formulating the error this way brings the contradiction of Booker into stark relief: Reading the Apprendi line of cases -- including Constitutional Booker -- one naively might have thought judicial fact-finding was precisely the constitutional error. Because Remedial Booker allowed the

_____

[20]For obvious reasons, this Sentencing Memorandum will focus primarily on First Circuit decisions. Not much of what will be said is unique to the decisions of that court, though. Where relevant, decisions from other circuit courts will be noted.

16

Guidelines' unconstitutionality to be remedied by concocting an advisory system, however, it is hard to find fault with the ruling in Antonakopoulos.

This premise then led the First Circuit to conclude that for a defendant to receive the benefits of Booker, he must "point to circumstances creating a reasonable probability that the district court would impose a different sentence more favorable to [him] under the new 'advisory Guidelines' Booker regime." Id. The court said that "this is a necessary consequence of our view of the nature of the Booker error." Id. at 79. The First Circuit is not alone. See United States v. Liner, 435 F.3d 920 (8th Cir. 2005); United States v. Graham, 413 F.3d 1211 (10th Cir. 2005); United States v. Ameline, 409 F.3d 1073 (9th Cir. 2005); United States v. Mares, 402 F.3d 511 (5th Cir. 2005); United States v. Lee, 399 F.3d 864 (7th Cir. 2005); United States v. Rodriguez, 398 F.3d 1291 (11th Cir. 2005); see also United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).[21] The obvious disconnect between

_____

[21]But see United States v. Oliver, 397 F.3d 369, 377-81 (6th Cir. 2005) ("A sentencing error that leads to a violation of the Sixth Amendment by imposing a more severe sentence than is supported by the jury verdict would diminish the integrity and public reputation of the judicial system and also would diminish the fairness of the criminal sentencing system." (internal quotation marks omitted)); United States v. Davis, 397 F.3d 173 (3d Cir. 2005); United States v. Hughes, 396 F.3d 374, 379-81 (4th Cir. 2005) ("[T]o leave standing this sentence imposed under the mandatory guideline regime, we have no doubt, is to place in jeopardy the fairness, integrity or public reputation of judicial proceedings." (footnote and internal quotation marks omitted)); see also United States v. Williams, 399 F.3d 450, 459 (2d Cir. 2005) (following contrary circuit precedent, but stating that the

17

these decisions and the principle of Constitutional <u>Booker</u> was the earliest tangible indication that <u>Booker</u> is flawed.

Even more than what circuit courts have done with pre-<u>Booker</u> sentences, however, the emerging jurisprudence of Remedial <u>Booker</u>'s "reasonableness" review in the circuit courts shows how that opinion necessarily is at war with Constitutional <u>Booker</u>. Two cases from the First Circuit will serve to illustrate.

In <u>United States</u> v. <u>Jiménez-Beltre</u>, 440 F.3d 514 (2006), the First Circuit sitting <u>en banc</u> set forth its instructions to district courts regarding the role the Guidelines should play in sentencing. Affirming the procedure of Judge F. Dennis Saylor, who gave the Guidelines "substantial" (but not "controlling") weight, the court held that a sentencing judge should "first calculate the guideline sentence, then determine whether departures were warranted under the guidelines, and finally determine whether a non-guideline sentence was warranted by the relevant factors set forth in 18 U.S.C. § 3553(a) (2000)." <u>Id.</u> at 516.

Further, in <u>United States</u> v. <u>Pho</u>, 433 F.3d 53 (1st Cir. 2006), the First Circuit articulated a significant limit on the acceptable justifications for a non-Guidelines sentence. In <u>Pho</u> the district court had sought to reduce the infamous 100:1 ratio

procedure followed by the Third, Fourth, and Sixth Circuits to be "far more consonant with precepts of justice").

18

between a Guidelines sentence for crack- versus powder-cocaine.[22]
Id. at 57-59.   That the defendant's sentencing took place post-
Booker enabled that court, so it thought, to fashion a more just
sentence.   It applied a 20:1 ratio instead and derived a revised
range within which the court then sentenced the defendant.   Id.
at 58, 59.

---

[22]This popular nomenclature is slightly -- but significantly
-- inaccurate.   There are three forms of cocaine relevant to the
criminal code and the Guidelines.   Title 21, Section 841 of the
U.S. Code sets forth mandatory minima which are triggered at the
100:1 ratio for crimes involving powder-cocaine and "cocaine
base", respectively.   Cocaine base has been held to mean a form
of cocaine which generally is smoked, as opposed to powder-
cocaine which generally is snorted.   See United States v. Lopez-
Gil, 965 F.2d 1124, 1129-31 (1st Cir. 1992).   The Guidelines, on
the other hand, use the term "cocaine base" synonymously with
"crack-cocaine".   See United States Sentencing Commission,
Guidelines Manual § 2D1.1(c), comment (n.(D)) (Nov. 2005).   In
reality, "crack-cocaine" is only a subset of "cocaine base" as
used in the statute.   United States v. Medina, 427 F.3d 88, 92
n.3 (1st Cir. 2005).

   The difference between crack-cocaine and other forms of
cocaine base (presumably the more pure, and less popular,
"freebase" of Richard Pryor fame) is in the chemical process used
in their creation.   The Guidelines dichotomy, unlike the
statutory distinction between powder-cocaine and cocaine base, is
not based upon chemical composition, rather only physical
characteristics.   Still, the Guidelines equate freebase-cocaine
with powder-cocaine, separating those two forms from crack-
cocaine for sentencing purposes.   See USSG App. C, amend. 487.
Thus, to speak of a dichotomy between powder- and crack-cocaine
leaves ambiguous the status of freebase-cocaine, which the
statute and the Guidelines treat differently.   The factual
distinctions among these three forms of cocaine may be of
critical import in imposing sentences.

   Judge Torruella of the First Circuit has recently authored
two opinions of admirable clarity and precision, exhibiting an
uncommon understanding of these distinctions.   United States v.
Anderson, 452 F.3d 66, 83-87 (1st Cir. 2006); United States v.
Brown, 450 F.3d 76, 79-81 (1st Cir. 2006).

Reviewing congressional and Commission history on the issue,
the First Circuit concluded that because the ratio was a policy
decision of the Congress[23], the district court had erred by
"jerry-buil[ding]" its own Guidelines range.  Id. at 58, 59, 64.
"This approach [of the district court], which evinced a
categorical, policy-based rejection of the 100:1 ratio, amounted
to error as a matter of law."  Id. at 62.  It was "a policy
judgment, pure and simple."  Id.  Any departure from the
Guidelines is to be "based on case-specific circumstances, not on
general, across-the-board policy considerations."  Id.  To do

---

[23]The 100:1 Guidelines ratio certainly is the policy of
Congress more so than most other aspects of the Guidelines.
Several years after having adopted the 100:1 ratio, the
Commission attempted to reduce it to the very 20:1 ratio employed
by the district Court in Pho.  Congress rejected this change.  It
had not, however, originally mandated its ratio "root and branch"
into the Guidelines; the statutory dichotomy is both different
from the Commission's and more chemically astute.  Title 21,
Section 841 of the U.S. Code sets forth mandatory minima which
are triggered by crimes involving powder-cocaine and cocaine base
at the 100:1 ratio.  The Guidelines, on the other hand, use the
100:1 ratio in devising which sentencing ranges correlate with
certain amounts of non-crack- versus crack-cocaine.  See USSG §
2D1.1(c).

If the Commission truly had followed the original
congressional policy expressed in the statute, it would have
followed the statutory dichotomy, as opposed to creating one of
it own.  As a consequence, the tortured harmonization of the
statute and Guidelines is that crimes involving freebase-cocaine
(statutory "cocaine base") are subject to the same statutory
mandatory minima as crack-cocaine, but not to the enhanced
Guideline ranges.  See supra note 22.

otherwise would jeopardize the uniformity sought by the
Sentencing Reform Act.[24]

Even a cursory glance at the plain language of Jiménez-
Beltre and Pho indicates the continued significance of the
Guidelines in criminal sentencing. Upon closer consideration,
however, that significance proves functionally tantamount to a
determinative (and thus unconstitutional) limitation on
sentencing discretion.

With regard to the prohibition on policy-based
justifications announced in Pho, consider that the whole of the
Guidelines -- albeit through its "junior-varsity Congress", the
Sentencing Commission, Mistretta v. United States, 488 U.S. 361,
427 (1989) (Scalia, J., dissenting) -- is but one big policy
statement of Congress.[25]  The Guidelines express the relative
weight Congress gives to various factors considered at

---

[24]See also United States v. Miller, 450 F.3d 270, 273-76
(7th Cir. 2006); United States v. Duhon, 440 F.3d 711, 720 (5th
Cir. 2006); United States v. Eura, 440 F.3d 625, 632-34 (4th Cir.
2006); United States v. Lazenby, 439 F.3d 928, 933 (8th Cir.
2006) (stating that a desire for more lenient sentences generally
was "an issue for Congress, not a valid basis for exercising
discretion under Booker."; United States v. Green, 436 F.3d 449,
459 (4th Cir. 2006); United States v. Sebastian, 436 F.3d 913,
915-16 (8th Cir. 2006).

[25]Cage, 451 F.3d at 593 ("When a district court makes a
sentencing decision, it must interpret Congress's intentions in
passing sentencing laws.  The Sentencing Guidelines are an
expression of that intent . . . ."); Comment, United States v.
Pho: Reasons and Reasonableness in Post-Booker Appellate Review,
115 Yale L.J. 2183, 2191 (2006) ("[B]eneath almost every
provision lies a policy judgment deserving of some measure of
judicial respect.").

sentencing. If a sentencing court may not depart from a
Guidelines range for policy reasons contradictory to those
expressed therein, then the only way to ensure respect for those
policy choices is through enforcement of the Guidelines
themselves. Pho accomplishes this.

In Pho, the relevant policy expressed in the Guidelines was
that persons guilty of "crack crimes" be eligible for the same
sentences as those found guilty of mere "powder crimes", though
having possessed 100-times less cocaine. The 100:1 policy
decision, however, is no different than any other Guidelines
ratio. According to the Guidelines, it is 7 times worse if the
loss from a robbery exceeds $5 million than if it is less than
$10,000. See USSG § 2B3.1(b)(7) (providing a 7-level enhancement
for the former, but 1 level for the latter).[26]  It is twice as
serious to cause a death while operating a common carrier while
under the influence than it is if a less-than-serious injury
resulted. See USSG § 2D2.3(a) (providing a 26-level enhancement
for the former, but 13 levels for the latter). Apparently,
illegally receiving 1000 firearms is five times worse than
receiving 5. See USSG § 2K2.1(b)(1) (providing a 10-level
enhancement for the former, but 2 levels for the latter). And it
is 50 percent worse to discharge a toxic substance if you do so

---

[26]The relative comparisons of Guidelines enhancements herein
do not equate to the same relative length of recommended
sentences. Enhancements simply adjust the base offense level.

22

continuously as opposed to just once. See USSG § 2Q1.2(b)(1) (providing a 6-level enhancement for the former, but 4 levels for the latter). There are also inherent policy judgments for incongruous facts: It is worse to mail obscene matter to a minor, see USSG § 2G3.1(b)(1)(C) (5-level enhancement), than it is to discharge pollutants and cause disruption of public utilities, see USSG § 2Q1.3(b)(3) (4 levels), or than it is to be a supervisor of a criminal activity, see USSG § 3B1.1(b) (3 levels), or than it is for the abetter in an escape to be a correctional employee, see USSG § 2P1.1(b)(4) (2 levels). Furthermore, though certain victims may think otherwise, it is worse to inflict permanent or life-threatening injury to someone while assaulting them, see USSG § 2A2.2(b)(3)(C) (7-level enhancement), than while robbing them, see USSG § 2B3.1(b)(3)(C) (6 levels), or while kidnapping them, see USSG § 2A4.1(b)(2)(A) (4 levels).

None of this is to criticize the policy choices Congress, through the Commission, has made. The point merely is that these 7:1, 2:1, 5:1, 1.5:1, 5:4:3:2, and 7:6:4 Guidelines ratios[27] are no different than the 100:1 Guidelines ratio for crack- versus

---

[27]To be scrupulously accurate, it must be noted that these enhancements should be considered in relation to the base offense levels to which they are added. Thus, there may be good reason, in light of the underlying crime, that the same conduct warrant a greater enhancement in certain situations than in others. Though this observation may detract from the numerical accuracy of the stated ratios, it does not weaken their status as policy choices.

23

non-crack-cocaine ruled controlling in Pho. If a sentencing court imposes a non-Guidelines sentence based on its own conclusions about the relevance or relative significance of facts deemed relevant by the Guidelines, it necessarily derogates policy choices of Congress.

The First Circuit did leave open the possibility of imposing a non-Guidelines sentence "grounded in case-specific considerations". Pho, 433 F.3d at 65. That court claimed it "d[id] not intend to diminish the discretion that, after Booker, district courts enjoy in sentencing matters . . . . [Its] goal [wa]s simply to channel the district courts' newfound discretion in ways that both comport with the Booker Court's remedial opinion and respect the separation of powers between the legislative and judicial branches of government." Id. Upon examining the hundreds of pages constituting the Guidelines, however, there are few factors that remain case-specific; the Guidelines have considered, accounted for, and determined congressional policy for the relative treatment of countless facts that otherwise might be deemed case-specific. Many of these Guidelines are even conveniently labeled "Policy Statement[s]", instructing a court on how to handle factors "ordinarily not relevant", "of a kind not adequately taken into consideration [by the Guidelines]" (whether identified by the Guidelines or not), or "present to a degree not adequately taken into consideration". USSG §§ 5H1.1-1.12, 5K2.0(a)(2)-(4). The

24

Guidelines state that such deviations are warranted only in "exceptional" cases, USSG § 5K2.0(a)(2)-(4), and are predicted to be "highly infrequent", USSG § 1A1.1 (Part A.4.(b)) (Editorial Note).

By Pho's standards, then, the Guidelines effectively make the treatment of every conceivable fact potentially relevant to sentencing an expressed policy decision of Congress. Perhaps recognizing this, the First Circuit seemingly has stepped back from the full implications of Pho and also ruled that simply because "a factor is discouraged or forbidden under the guidelines[, that] does not automatically make it irrelevant when a court is weighing the statutory factors [18 U.S.C. § 3553(a)(1)-(7)] apart from the guidelines. The guidelines -- being advisory -- are no longer decisive as to factors any more than as to results." United States v. Smith, 445 F.3d 1, 5 (2006). The court quickly added, however, that "reliance on a discounted or excluded factor may . . . have some bearing on reasonableness." Id.; see United States v. Zapete-Garcia, 447 F.3d 57, 60 (1st Cir. 2006) ("Although this [Guidelines] policy statement is no longer binding, one of the seven factors a judge must consider in sentencing is 'any pertinent policy statement issued by the Sentencing Commission.' Therefore, while not controlling, the policy statement prohibiting reliance on arrest records must be duly considered by the district judge." (citations omitted)). Respectfully, appellate guidance

25

concerning when it is permissible for a sentencing court to
deviate from the suggested Guideline range, based on what facts,
is mind-numbingly incoherent.[28]  The First Circuit is not
necessarily to blame; Remedial Booker, though, certainly is.

Jiménez-Beltre, with its debate among the judges of the
First Circuit, demonstrates Remedial Booker's contradictions more

_____

[28]Compare, e.g., United States v. Green, 436 F.3d 449, 459
(4th Cir. 2006) ("While [a defendant's employment record, which
is "not ordinarily relevant",] might support generally a
departure from the Sentencing Guidelines, it may be relied upon
then only if the factor is present to an exceptional degree."),
with United States v. Jackson, 408 F.3d 301, 305 n.3 (6th Cir.
2005) ("To the extent that the district court in resentencing
relies on any factors which are deemed by the Guidelines to be
prohibited or discouraged, the district court will need to
address these provisions and decide what weight, if any, to
afford them in light of Booker." (citations omitted)), and with
United States v. Hampton, 441 F.3d 284, 289 (4th Cir. 2006)
("Without deciding if a variance could be based on the existence
of a factor discouraged as a basis for departure under the
guidelines . . . .").

Compare also, e.g., United States v. Ossa-Gallegos, No. 05-
5824, 2006 WL 1788984 (6th Cir. June 30, 2006) (approving of a
district court's slight reduction in the defendant's sentence due
to disparity with similarly situated defendants in so-called
"fast track" districts), with United States v. Martinez-Flores,
428 F.3d 22, 29 n.3 (1st Cir. 2005) ("It is arguable that even
post-Booker, it would never be reasonable to depart downward
based on disparities between fast-track and non-fast-track
jurisdictions given Congress' clear (if implied) statement in the
PROTECT Act provision that such disparities are acceptable.").

Compare also, e.g., United States v. Boscarino, 437 F.3d
634, 638 (7th Cir. 2006) ("[T]he kind of 'disparity' with which §
3553(a)(6) is concerned is an unjustified difference across
judges (or districts) rather than among defendants to a single
case."), with Thurston, 2006 WL 2065404, at *4 ("[O]ne possible
problem with the [district] court's rationale was the emphasis on
disparities between codefendants without giving significant
consideration to encouraging nationwide uniformity in sentencing
-- the primary focus of § 3553(a)(6)."), and with United States
v. Lazenby, 439 F.3d 928, 933 (8th Cir. 2006) (reversing sentence
due to disparate sentence of co-defendant).

clearly still. In ruling that the Guidelines are to receive "substantial" weight, the majority of the First Circuit stated that its "conclusion [wa]s rooted in both parts of the Booker decision". Jiménez-Beltre, 440 F.3d at 518. The court first rejected the government's argument that a sentence within the Guidelines was per se reasonable, id. at 517, before then declaring that "the guidelines continue in our view to be an important consideration in sentencing . . . ", id. at 518. The court acknowledged that even though "making the guidelines 'presumptive' or 'per se reasonable' does not make them mandatory, it tends in that direction". Id. Still, the Guidelines "cannot be called just 'another factor' in the statutory list, 18 U.S.C. 3553(a) (2000), because they are the only integration of the multiple factors". Id. The fact that the Guidelines are promulgated by an "expert" agency and that they were important to promoting remedial Booker's "uniformity and fairness" concerns counseled in favor of their continued central role. Id.

Judge Howard concurred in the result, but would have held within-Guidelines sentences per se reasonable. See id. at 523 ("[T]here is a range of 'reasonable' sentences which always will include within it the guidelines sentencing range . . . ."). This, he reasoned, was because "'[r]easonableness' within the meaning of Booker . . . is 'reasonableness in light of Congress's purposes in enacting the Sentencing Reform Act of 1984.'" Id. at

27

521-22. "The guidelines therefore are not only central to the uniformity that Congress sought to bring about in passing the Act; they also are the data-driven and experienced-based manifestations of Congress's considered views on how, in the usual case, to accomplish the purposes of federal sentencing." Id. at 522. Judge Howard observed that "the primary theme of Justice Breyer's remedial opinion is that Congress's purposes were and are valid, and that federal judges should strive to apply the Act (and the regime created by the Act, almost all of which was left intact) to further those purposes." Id. "[T]he guidelines . . . are the only conceivable centers of gravity around which some semblance of uniformity in federal sentencing might be maintained . . . ." Id. at 522-23.

Judge Lipez, on the other hand, dissented and would have ruled that the Guidelines are merely an important first step. Beyond that, however, "[t]here is scant difference between treating a guidelines sentence as presumptively controlling and stating that the court will depart from that sentence only for 'clearly identified and persuasive reasons.'" Id. at 524 (quoting Judge Saylor at the sentencing hearing). By organizing sentencing decisions around the Guidelines and only focusing on the question of whether a non-Guidelines sentence is reasonable, courts "will effectively give the guidelines a controlling weight and a presumptive validity that is difficult to defend under the constitutional ruling in Booker." Id. at 528. Having the

28

sentencing court start the process by calculating the Guidelines is "sensible" because "[t]he guidelines are the only sentencing factor that yield a measure of time. That fact alone establishes their continuing importance. . . . With [the Guidelines'] focus on the bottom line, the prosecution and defense counsel will inevitably address their arguments to the appropriateness or inappropriateness of a guidelines sentence." Id. at 525. Such a method would "steer a sensible course between" the two Booker opinions. Id. at 525.

This display by the First Circuit shows the judges of that court grappling with the inconsistency of Booker. Every judge was attempting faithfully to implement the mandates of that decision, yet doing so proved difficult in the face of its incoherence. When forced to reconcile the inconsistency, Judge Lipez placed more weight on Constitutional Booker[29], Judge Howard on Remedial Booker[30], and the majority somewhere in between.

Is this but a manufactured debate? Indeed, the only clear mandate from the Supreme Court going forward is that sentencing

---

[29]See Jiménez-Beltre, 440 F.3d at 528 n.11 (Lipez, J., dissenting) ("Many commentators argue that by giving the guidelines controlling weight, and abdicating the responsibility to take account of the other section 3553(a) factors, courts effectively make the guidelines as binding as they were before Booker, thereby violating Booker's constitutional command." (internal quotation marks and alteration omitted)).

[30]See Jiménez-Beltre, 440 F.3d at 522 (Howard, J., concurring) (noting that the "primary theme of Justice Breyer's remedial opinion" was that the Act -- and, therefore, the Guidelines -- should be given effect).

courts "consult [the] Guidelines and take them into account when sentencing."  Booker, 543 U.S. at 264.  From this language, why the Guidelines should receive any special emphasis over the other factors in Section 3553(a) is quite unclear.  See D'Addio, supra, at 175-78 ("Booker imposes no legal obligation on judges to place any particular weight on the Sentencing Guidelines.").  This fact certainly was not lost on anyone: Both Judges Howard and Lipez acknowledged that nothing in Booker required his particular interpretation.[31]  If all that a sentencing judge must do,

---

[31]See Jiménez-Beltre, 440 F.3d at 521 (Howard, J., concurring) ("Certainly I cannot say that these positions are required by the language of Booker (nor, however, are they inconsistent with that language)."); id. at 528 n.11 (Lipez, J., dissenting) (quoting Justice Scalia's dissent to Remedial Booker "stating that 'logic compels the conclusion that the sentencing judge, after considering the recited factors (including the Guidelines), has full discretion, as full as what he possessed before the Act was passed, to sentence anywhere within the statutory range.  If the majority thought otherwise . . . its opinion would surely say so.'" (citing Booker, 543 U.S. at 305) (alteration in original)).

See also Booker, 543 U.S. at 300 (Stevens, J., dissenting in part) ("True, judges must still consider the sentencing range contained in the Guidelines, but that range is now nothing more than a suggestion that may or may not be persuasive to a judge . . . ."); id. at 306 n.4 (Scalia, J., dissenting in part) ("The closest the remedial majority dares come to an assertion that the Guidelines must be followed is the carefully crafted statement that '[t]he district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing.'  The remedial majority also notes that the Guidelines represent what the Sentencing Commission 'finds to be better sentencing practices.'  True enough, but the Commission's view of what is 'better' is no longer authoritative, and district judges are free to disagree -- as are appellate judges." (citations omitted, alteration in original)).

however, is "consult" the Guidelines -- a concept straightforward enough -- what is the source of this disagreement?

One of Judge Howard's observations answers the question: "[T]he primary theme of Justice Breyer's remedial opinion is that Congress's purposes were and are valid, and that federal judges should strive to apply the Act (and the regime created by the Act, almost all of which was left intact) to further those purposes." Jiménez-Beltre, 440 F.3d at 522. Countless courts and commentators have concluded the same. See, e.g., United States v. Mykytiuk, 415 F.3d 606, 607 (7th Cir. 2005) ("But while a per se or conclusively presumed reasonableness test would undo the Supreme Court's merits analysis in Booker, a clean slate that ignores the proper Guidelines range would be inconsistent with the remedial opinion."); United States v. Crosby, 397 F.3d 103, 113 (2d Cir. 2005) ("These principles change the Guidelines from being mandatory to being advisory, but it is important to bear in mind that Booker/Fanfan and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge. Thus, it would be a mistake to think that, after Booker/Fanfan, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the statutory maximum and minimum."); Bowman, supra, at 182 ("Some have been tempted to read advisory to mean that the Guidelines are no longer legally binding on trial judges and that [they] are

now merely useful suggestions to trial courts. However, a closer reading of the opinion suggests something quite different. . . . [Remedial Booker] strongly intimates that the guideline ranges produced by applying the rules to the facts continue to constrain judicial discretion."); D'Addio, supra, at 178 ("Justice Breyer's [Remedial Booker] opinion implies that reasonableness review will be more rigorous than simply determining whether the district courts checked the correct boxes."). Justice Scalia made the point more forcefully in his dissent to Remedial Booker. See 543 U.S. at 306-13. He wrote, "Even the most casual reading of this section [of Remedial Booker, which discusses appellate review,] discloses that its purpose -- its only purpose -- is to enable the courts of appeals to enforce conformity with the Guidelines. . . . If the Guidelines are no longer binding, one would think that the provision designed to ensure compliance with them would, in its totality, be inoperative." Id. at 306 (Scalia, J., dissenting in part). Therefore, the intimations of Remedial Booker, which conflict with the rule of Constitutional Booker more squarely than even its incongruous remedy, necessitate debates such as those in Jiménez-Beltre.[32]

_____

[32]Cf. United States v. Zavala, 443 F.3d 1165, 1170 (9th Cir. 2006) ("[A] presumption at the district court would give undue weight to the Guidelines. The dangers averted by declaring them to be merely advisory would become recrudescent. Some might say that this is just semantics and that the same process will take place regardless of what we call it, but that is unduly cynical.").

     Judge Gertner has explained the significance of this

32

Judge McConnell has suggested that Remedial Booker could be
viewed as "a pragmatic attempt by supporters of the Guidelines
system, four of whom dissented from the Stevens majority, to
patch together a workable sentencing system as close to the
Guidelines as was possible under the circumstances.
Responsibility for the inconsistency between violation and
remedy, according to this theory, must lie with the remedial
majority, which was unwilling to accede to the force of a Sixth
Amendment holding with which they disagreed." McConnell, supra,
at 679; see also M.K.B. Darmer, The Federal Sentencing Guidelines
after Blakely and Booker: The Limits of Congressional Tolerance
and a Greater Role for Juries, 56 S.C. L. Rev. 533, 564 (2005)
("While [Constitutional Booker] was a natural outgrowth of the
Court's recent jurisprudence, [Remedial Booker] produced a
jarring result in attempting to salvage as many current features
of the Guidelines as possible while effectuating an end-run

---

discussion with the psychological concept of "anchoring":
    Anchoring is a strategy used to simplify complex tasks,
    in which "numeric judgments are assimilated to a
    previously considered standard." When asked to make a
    judgment, decision-makers take an initial starting
    value (i.e., the anchor) and then adjust it up or down.
    Studies underscore the significance of that initial
    anchor; judgments tend to be strongly biased in its
    direction. In effect, the 300-odd page Guideline
    Manual provides ready-made anchors.
Gertner, supra note 4. Judge Lipez made the same point with a
more philosophical tone in his Jiménez-Beltre dissent: "Word
choices matter because they reflect mental processes, and mental
processes matter because they organize information for the
decision-maker." Jiménez-Beltre, 440 F.3d at 530.

33

around the Sixth Amendment requirements [Constitutional <u>Booker</u>] recognized."). Though Judge McConnell is judicious in his critique, suggesting that "this is not the whole story" and finding fault with Constitutional <u>Booker</u> as well, <u>id</u>.[33], all indications are that his initial criticism of Remedial <u>Booker</u> is precisely on point. Justice Stevens said as much in his dissent to Remedial <u>Booker</u>: "In reality, the majority's concerns . . . are nothing more than an objection to <u>Apprendi</u> itself . . . ." <u>Booker</u>, 543 U.S. at 288; <u>see also</u> <u>Ring</u> v. <u>Arizona</u>, 536 U.S. 584, 612 (2002) (Scalia, J., concurring) ("Justice Breyer . . . refuses to accept <u>Apprendi</u> . . . .").[34] As a result, the Guidelines -- and their judge-made factual findings -- are still <u>the</u> driving force behind federal sentencing.[35] It must be so:

---

[33]<u>But see</u> <u>infra</u> Part III.A.

[34]<u>See also</u> <u>Harris</u> v. <u>United States</u>, 536 U.S. 545, 569 (2002) (Breyer, J., concurring) ("I continue to believe that the Sixth Amendment permits judges to apply sentencing factors -- whether those factors lead to a sentence beyond the statutory maximum (as in <u>Apprendi</u>) or the application of a mandatory minimum (as [in <u>Harris</u>])."); <u>Blakely</u>, 542 U.S. at 346 (Breyer, J., dissenting) ("Taken together these three sets of considerations, concerning consequences, concerning history, and concerning institutional reliance, leave me where I was in <u>Apprendi</u>, <u>i.e.</u>, convinced that the Court is wrong.").

[35]<u>See</u> <u>United States</u> v. <u>Crosby</u>, 397 F.3d 103, 110-11 (2d Cir. 2005) ("<u>Booker</u>/<u>Fanfan</u> can be expected to have a significant effect on sentencing in federal criminal cases, although perhaps not as drastic an effect as some might suppose."). The Second Circuit has proved prescient. Nationwide, within-Guidelines sentences account for 62.6% of all <u>post-Booker</u> sentences, compared with only 72.2% pre-<u>Blakely</u>. <u>U.S. Sentencing Commission Special Post</u>-Booker <u>Coding Project</u>, May 24, 2006, <u>at</u> http://www. ussc.gov/Blakely/postBooker_052306.pdf. Adding in substantial

"Reasonableness" has been defined in terms of the Guidelines.[36]

---

assistance and other government-sponsored downward departures accounts for 85.9% of sentences post-Booker, compared to 94.1% pre-Blakely.  Such differences hardly represent a radical change in federal sentencing.

[36]The First Circuit is in the minority of circuits which does not give a within-Guidelines sentence a presumption of reasonableness.  See also United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006); United States v. Cooper, 437 F.3d 324, 331-32 (3d Cir. 2006); United States v. Zavala, 443 F.3d 1165, 1168-70 (9th Cir. 2006).  Even in these circuits, however, the Guidelines are given paramount consideration.  See, e.g., United States v. Rattoballi, 452 F.3d 127, 133 (2d Cir. 2006) (stating that non-Guidelines sentences would be viewed as "inherently suspect" on appellate review).  Most circuits give even less weight to Constitutional Booker by starting with just such a presumption of reasonableness.  See United States v. Dorcely, No. 05-3130, -- F.3d --, 2006 WL 2034245, at *7 (D.C. Cir. July 21, 2006); United States v. Johnson, 445 F.3d 339, 341 (4th Cir. 2006); United States v. Kristl, 437 F.3d 1050, 1054 (10th Cir. 2006); United States v. Williams, 436 F.3d 706, 708 (6th Cir. 2006); United States v. Alonzo, 435 F.3d 551, 554 (5th Cir. 2006); United States v. Mykytiuk, 415 F.3d 606, 608 (7th Cir. 2005); United States v. Lincoln, 413 F.3d 716, 717-18 (8th Cir. 2005).  Another circuit has simply said that a within-Guidelines sentence "ordinarily" would be reasonable.  See United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005).  No court of appeals has held a Guidelines sentence to be per se reasonable.
    Additionally, the rule in many circuits, including the First, is that "the farther the judge's sentence departs from the guidelines sentence . . . , the more compelling the justification based on factors in section 3553(a) that the judge must offer."  United States v. Dean, 414 F.3d 725, 729 (7th Cir. 2005); see Smith, 445 F.3d at 4 (quoting Dean); United States v. Smith, 440 F.3d at 404, 707 (5th Cir. 2006) (same); Lazenby, 439 F.3d at 932; United States v. McManus, 436 F.3d 1177, 1187 n.10 (8th Cir. 2006).
    The reason most circuits give for applying this presumption is that the Guidelines are the only Section 3553(a) factor which accounts for all the others.  See United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006); United States v. Johnson, 445 F.3d 339, 342-43 (4th Cir. 2006); Jiménez-Beltre, 440 F.3d at 518; Mykytiuk, 415 F.3d at 607; United States v. Lazenby, 439 F.3d 928, 932 (8th Cir. 2006); see also Cooper, 437 F.3d at 331.  This position comports with the Sentencing Commission's pronouncements.  See Prepared Statement of Hon. Ricardo H.

35

Hinojosa, Chair, U.S. Sentencing Commission before the House
Judiciary Committee, Mar. 16, 2006, at 2 ("During the process of
developing the initial set of guidelines and refining them
throughout the ensuing years, the Commission has considered the
very factors listed at section 3553(a) that were cited with
approval in Booker.  . . .  In short, sentencing courts should
give substantial weight to the Federal Sentencing Guidelines as
they are the product of years of careful study and represent the
integration of multiple sentencing factors." (footnotes
omitted)), at http://www.ussc.gov/booker_report/03_16_06
Booker%20Testimony.pdf.  The position of the Commission in this
regard has been sharply criticized.  See Gertner, supra note 4
("Now, post-Booker, it is, as Yogi Berra would say, déjà vu all
over again.  The Commission sings the same tune -- sentencing
uniformity above all else.  It could have announced a plan to
generate more studies about efficacy, deterrence, or crime
control to inform Guideline development as well as guide judges'
Booker discretion.  It could have provided new, detailed findings
to encourage a more nuanced Guideline interpretation.  It did
not.  Instead, it has announced -- ipse dixit -- that the
Guidelines already embody all purposes of sentencing, and has
thrown its influence behind the 'Guidelines-as-presumptively-
reasonable' camp.");

Though the presumption is purportedly rebuttable, as of July
31, 2006, the Sentencing Law and Policy Blog kept by Professor
Douglas A. Berman of The Ohio State University Moritz College of
Law (http://www.sentencing.typepad.com), and which reports in
near-realtime on Booker and other sentencing issues, had noted
only a single case in which a within-Guidelines sentence was
reversed as unreasonable.  Lazenby, 439 F.3d at 933 (reversing
sentence based comparison to co-defendant's sentence); see also
United States v. Carty, No. 05-10200, -- F.3d --, 2006 WL 1975895
(9th Cir. July 17, 2006) (reversing sentence where judge failed
to provide adequate explanation of within-Guidelines sentence);
United States v. Vonner, 452 F.3d 560 (6th Cir. 2006) (same); see
also Eric Citron, Sentencing Review: Judgment, Justice, and the
Judiciary, Yale L.J. (The Pocket Part), July 2006,
http://www.thepocketpart.org/2006/07/citron.html ("[O]ne can comb
through mountains of case law from any circuit before finding a
within-Guidelines sentence reversed as unreasonable.").
Affirmances of the same were "[f]ar too many to list".  See
Cooper, 437 F.3d at 331 ("[I]t is less likely that a within-
guidelines sentence, as opposed to an outside-guidelines
sentence, will be unreasonable"); United States v. Mares, 402
F.3d 511, 519 (5th Cir. 2005) ("[I]t will be rare for a reviewing
court to say [a within-Guidelines sentence] is 'unreasonable.'").

Perhaps more disturbing is the trend becoming evident that

See D'Addio, supra, at 192-94. Nobody doubts that Remedial
Booker contemplated just that. Neither should anyone doubt,
however, that such a scheme violates the rule of Constitutional
Booker. "[T]o the degree that 'reasonableness' cabins
discretion, the Sixth Amendment problem resurfaces." Id. at 192.
Even Justice Breyer recognized that appellate restrictions on
judicial discretion could offend Apprendi and Blakely. Booker,
435 U.S. at 332-33 (Breyer, J., dissenting). He quickly stated
in conclusory fashion, though, that "[a]ppellate courts' efforts

circuit courts more frequently reverse below-Guidelines sentences
than above-Guidelines sentences. See Sentencing Law and Policy
Blog, July 31, 2006 (noting -- in an admittedly noncomprehensive
list -- 39 cases of the former, but only 4 cases of the latter);
see also U.S. Sentencing Commission, Final Report on the Impact
of United States v. Booker On Federal Sentencing 30 (Mar. 2006),
available at http://www.ussc.gov/ booker_report/Booker_Report.pdf
(exhibiting same trend); United States v. Meyer, No. 06-1283, --
F.3d --, 2006 WL 1889309, at *2 n.3 (8th Cir. July 11, 2006)
(Heaney, J., for himself) (reviewing the same trend in the Eighth
Circuit). This trend is strikingly similar to circuit court
review of upward and downward departures under the "mandatory
Guidelines" regime and lends an interesting perspective on
Justice Breyer's reference to "the past two decades of appellate
practice in cases involving departures" as he instructed circuit
courts on what "reasonableness" review under the "advisory
Guidelines" was to be. Booker, 543 U.S. at 261.

One might argue that "[p]roperly understood . . . ,
reasonableness . . . is primarily an appellate, not a trial court
device. '[A] district court's mandate is to impose a sentence
sufficient, but not greater than necessary, to comply with the
purposes of section 3553(a). Reasonableness is an appellate
standard of review in judging whether a district court has
accomplished its task.'" United States v. Buchanan, 449 F.3d
731, at 740 (6th Cir. 2006) (Sutton, J., concurring) (third
alteration in original) (quoting United States v. Foreman, 436
F.3d 638, 644 n.1 (6th Cir. 2006)). Can it seriously be argued,
though, that appellate standards of review do not or should not
influence a sentencing court's use of its discretion?

37

to define the limits of the 'reasonable' of course would fall
outside <u>Blakely</u>'s scope." <u>Id.</u> at 333; <u>see</u> D'Addio, <u>supra</u>, at
190-92. In this instance, Justice Breyer's reasoning is more
persuasive than his conclusion.

Justice Scalia warned that "the remedial majority[] . . .
may lead some courts of appeals to conclude -- may indeed be
<u>designed</u> to lead courts of appeals to conclude -- that little has
changed." <u>Id.</u> at 311-12 (emphasis added). He questioned whether
"appellate review for 'unreasonableness' preserved <u>de facto</u>
mandatory Guidelines by discouraging district courts from
sentencing outside Guidelines ranges". <u>Id.</u> at 313.[37]

_____

[37]Circuit courts are not the only source of pressure on
sentencing judges to follow the Guidelines. Among the provisions
of the widely criticized Feeney Amendment to the PROTECT Act, <u>see</u>
<u>Green</u>, 346 F. Supp. 2d at 283-89, was a requirement that
sentencing judges report to the Commission their reasons for
departing downward from the recommended Guidelines sentence. <u>See</u>
Pub. L. No. 108-21, § 401, Stat. 650, 657 (2003). This Court's
own experience with the reporting requirement is recounted in its
<u>Green</u> opinion. 346 F. Supp. 2d at 332 n.388. Remedial <u>Booker</u>
did not affect this meddling mandate.

As if that were not enough, one provision of the recently
renewed USA PATRIOT Act requires judges to report their reasons
for downwardly departing on a common form whose format is
approved by the Commission. Pub. L. No. 109-177, § 735, 120
Stat. 192, 271 (2006). The Judgment and Commitment Order (form
AO 245B) is now used for this purpose. <u>See</u> <u>infra</u> note 76. The
form takes much less effort to complete if the sentencing judge
has sentenced within the Guidelines range, providing convenient
boxes to check if the judge issues a within-Guidelines sentence,
but requiring an essay if she does not. In addition, as Judge
Gertner has pointed out, the Commission periodically releases
statistics on district court "conformance" with the Guidelines.
Gertner, <u>supra</u> note 4.

I believe that judges strive faithfully to maintain their
independence in these matters, but in the face of such pressure
-- both subtle and no-so-subtle -- it is, no doubt, becoming more

38

Does anyone now doubt that Justice Scalia was correct?

### D.    The Real Dispute

As did the Sentencing Reform Act, Remedial <u>Booker</u> purports
to be concerned most with uniformity in criminal sentencing.
<u>See, e.g.</u>, <u>Booker</u>, 543 U.S. at 250 (calling "a system that
diminishes sentencing disparity" one of "Congress'[s] basic
statutory goal[s]"); <u>id.</u> at 255 ("Congress enacted the sentencing
statutes in major part to achieve greater uniformity in
sentencing . . . ."). One wonders, then, how removing the
provision that makes the Guidelines mandatory for all judges
promotes the goal of uniformity. Justice Scalia noted that it
was "wonderfully ironic" that "[i]n order to rescue from
nullification a statutory scheme designed to eliminate
discretionary sentencing, [Remedial <u>Booker</u>] discarded the
provisions that eliminate discretionary sentencing." <u>Id.</u> at 304
(Scalia, J., dissenting in part).[38]

---

difficult. <u>See</u> <u>Kirsh</u>, 287 F. Supp. 2d at 1006-07 (Magnuson, J.)
("[T]he Court is intimidated, and the Court is scared to
depart.").

[38]Many, including the dissenting Justices in <u>Apprendi</u>, have
accused the Supreme Court's recent Sixth Amendment jurisprudence
regarding trial by jury of "invalidat[ing] . . . three decades'
worth of nationwide [sentencing] reform", which strove for
increased uniformity in criminal sentences. <u>Apprendi</u>, 530 U.S.
at 550 (O'Connor, J., dissenting). In reaction to <u>Booker</u> -- and
the downward departures from the Guidelines it authorized judges
to give -- Congress is gearing up to pass new, likely harsher
sentencing legislation. <u>See</u> Press Release, Representative F.
James Sensenbrenner, Sensenbrenner Expresses Concern Over Federal

According to Justice Breyer, this criticism missed the point. When Congress sought "to move the sentencing system in the direction of increased uniformity", it (oddly) did not mean "uniformity" in the sense of "similar sentences for those convicted of the same statute". Booker, 453 U.S. at 253. The uniformity that mattered consisted "more importantly[] of similar relationships between sentenced and real conduct". Id. at 254.[39]

_____

Sentencing Practices Detailed in New Report (Mar. 14, 2006), available at http://releases.usnewswire.com/ GetRelease.asp?id=62345.

Contrary to many accusations, see, e.g., Blakely, 542 U.S. at 326 (O'Connor, J., dissenting) ("What I have feared most has now come to pass: Over 20 years of sentencing reform are all but lost . . . ."), this reaction was not the necessary consequence of Apprendi and Blakely. It was Remedial Booker that exalted a "judge-based sentencing system", 543 U.S. at 265, over a rule that would have kept the existing mandatory system intact, adding only a requirement that the jury find the necessary Guidelines facts. "[Remedial Booker] was not the inevitable result of the [Supreme] Court's holding that Blakely applies to the Guidelines. Neither Apprendi, nor Blakely, nor [Booker] made determinate sentencing unconstitutional." Booker, 543 U.S. at 301 (Stevens, J., dissenting in part); cf. Blakely, 542 U.S. at 308 ("This case is not about whether determinate sentencing is constitutional, only about how it can be implemented in a way that respects the Sixth Amendment."). Make no mistake: For ill or good, it is Remedial Booker -- the work of Apprendi and Blakely critics -- that has created the current status of federal sentencing.

[39]In Remedial Booker, Justice Breyer did not mention that the "real conduct" focus of the Guidelines -- as opposed to "charged conduct" -- was a policy choice not of Congress, but of the Sentencing Commission (on which then-Judge Breyer sat). See USSG § 1A1.1 (Editorial Note) (calling the choice between a "real offense" system and a "charge offense" system "[o]ne of the most important questions for the Commission to decide" (emphasis added)). Though Congress subsequently approved of the Commission's system, the Act itself did not mandate the Guidelines' emphasis on "real conduct".

40

From this premise, Remedial Booker proceeded to the solution
announced.  It eschewed the notion that a jury could determine
the "real conduct that underlies the crime of conviction", which
was "Congress'[s] basic statutory goal".  Id. at 250.  The
Guidelines were too complex for juries to administer in a way
that achieved this notion of uniformity, claimed the Remedial
Booker majority as it posed a series of hypothetical defendants
and crimes.  See id. at 253-55.  "How would a jury measure 'loss'
in a securities fraud case -- a matter so complex as to lead the
Commission to instruct judges to make 'only . . . a reasonable
estimate'?"  Id. at 255 (citing USSG § 2B1.1, comment (n.3(C)).
No, it said, the system is "judge-based", Booker, 453 U.S. at
268; requiring the jury to administer the Guidelines would not
comport with goals of the Sentencing Reform Act, id. at 249-50.
"[T]he constitutional jury trial requirement is not compatible
with the Act as written . . . ."  Id. at 248.

Remedial Booker argued that if a jury requirement were
"engraft[ed]" onto the Guidelines it would "weaken the tie
between a sentence and an offender's real conduct."  543 U.S. at
252.  "The other approach, which we now adopt, would (through
severance and excision of two provisions) make the Guidelines
system advisory while maintaining a strong connection between the
sentence imposed and the offender's real conduct -- a connection
important to the increased uniformity of sentencing that Congress
intended its Guidelines system to achieve."  Id. at 246.

Justice Breyer is surely correct that a charge-offense system would certainly impede the Guidelines' version of "real conduct" sentencing[40]; but "increasing a defendant's sentence on the basis of conduct not proved at trial[ ]is contrary to the very core of Apprendi." Id. at 288 (Stevens, J., dissenting in part). Apprendi mandated that, rather than the "real conduct" of the defendant, a sentence must be tied to the jury verdict. See Apprendi, 530 U.S. at 482 (speaking of "[t]he historic link between verdict and judgment"); see also Blakely, 542 U.S. at 306 ("Apprendi carries out th[e] [constitutional] design by ensuring that the judge's authority to sentence derives wholly from the jury's verdict." (emphasis added)); id. at 303 ("Our precedents make clear . . . that the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." (some emphasis added)). Justice Stevens, in his dissent to Remedial Booker, made this very point: "The [remedial] majority is correct . . . that my preferred holding would undoubtedly affect 'real conduct' sentencing in certain cases. This is so because the goal of such sentencing -- increasing a defendant's sentence on the basis of conduct not proved at trial

---

[40]"Real conduct" sentencing, of course, would be entirely constitutional if the facts that the law made relevant to a defendant's "real conduct" were proven to a jury beyond a reasonable doubt. See supra note 38.

42

-- is contrary to the very core of Apprendi." Booker, 543 U.S.
at 288.

Justice Breyer's views were not new to him in Booker.
Remedial Booker was simply the first time he could scrape
together a majority of his colleagues to support it.  In
Apprendi, Justice Breyer had complained that the rule announced
in that case "would seem to promote a procedural ideal -- that of
juries, not judges, determining the existence of those facts upon
which increased punishment turns.  But the real world of criminal
justice cannot hope to meet any such ideal."  530 U.S. at 555
(Breyer, J., dissenting).  His dissent in Blakely likewise raised
the issue: "How are juries to deal with highly complex or open-
ended Sentencing Guidelines obviously written for application by
an experienced trial judge?"  542 U.S. at 346-47.

As the Supreme Court has itself noted, "Justice Breyer's
more general argument -- that Apprendi undermines alternatives to
adversarial factfinding [i.e., judicial fact-finding] -- is not
so much a criticism of Apprendi as an assault on jury trial
generally."  Blakely, 542 U.S. at 312-13.  The Court has
repeatedly refuted the premise from which Justice Breyer
advances.  "Our Constitution and the common-law traditions it
entrenches . . . do not admit of the contention that facts are
better discovered by judicial inquisition than by adversarial
testing before a jury.  Justice Breyer may be convinced of the
equity of the regime he favors, but his views are not the ones we

43

are bound to uphold." Id. at 313 (citation omitted). Justice

Scalia had further expounded on this theme in his Apprendi

concurrence:

> [Justice Breyer] sketches an admirably fair and
> efficient scheme of criminal justice designed for a
> society that is prepared to leave criminal justice to
> the State. . . . The founders of the American
> Republic were not prepared to leave it to the State,
> which is why the jury-trial right was one of the least
> controversial provisions of the Bill of Rights. It has
> never been efficient; but it has always been free.
>
> As for fairness, which Justice Breyer believes "in
> modern times" the jury cannot provide: I think it not
> unfair to tell a prospective felon that if he commits
> his contemplated crime he is exposing himself to a jail
> sentence of 30 years . . . .
>
> In Justice Breyer's bureaucratic realm of perfect
> equity, by contrast, the facts that determine the
> length of sentence to which the defendant is exposed
> will be determined to exist (on a more-likely-than-not
> basis) by a single employee of the State. It is
> certainly arguable (Justice Breyer argues it) that this
> sacrifice of prior protections is worth it. But it is
> not arguable that, just because one thinks it is a
> better system, it must be, or even is more likely to
> be, the system envisioned by a Constitution that
> guarantees trial by jury.

530 U.S. at 498 (citation omitted). "We have always trusted

juries to sort through complex facts in various areas of law.

This may not be the most efficient system imaginable, but the

Constitution does not permit efficiency to be our primary

concern." Booker, 543 U.S. at 289 (Stevens, J., dissenting in

part). "The Framers would not have thought it too much to demand

that, before depriving a man of three more years of his liberty,

the State should suffer the modest inconvenience of submitting

its accusation to 'the unanimous suffrage of twelve of his equals

44

and neighbours' rather than a lone employee of the State."
Blakely, 542 U.S. at 313-14 (citation omitted).

## III. The Constitutional Mandate

That our laws routinely require a defendant's sentence to be
based upon what a judge believes an offender "really" did, as
opposed to the actual crime of which he was convicted by the
jury, is nothing less than offensive -- let alone
unconstitutional.[41]   "The notion that a defendant's sentence is
based upon his 'real offense' . . . begs the question: 'real'
according to whom, and according to what standard."  Darmer,
supra, at 544.  In truth, "real conduct" sentencing as embodied
in the Guidelines, is simply punishment for acts not

---

[41]A recent, appalling example is found in an unpublished,
per curiam opinion of the Eighth Circuit.  United States v.
Rashaw, No. 05-1839, 2006 WL 688041 (8th Cir. Mar. 20, 2006).
Rashaw had been convicted "on two counts of being a felon in
possession of a firearm and of one count of possessing an
unregistered firearm."  Id. at *1.  The district court in
calculating the Guidelines, however, set the Guidelines offense
level based on "evidence" that Rashaw had, in another incident
and with another gun, committed a double murder.  Rashaw had
never been charged with these crimes, much less convicted.  Id.
The resulting Guidelines range being higher than the statutory
maximum, the court sentenced Rashaw to three consecutive ten-year
terms.  Id.  The Eighth Circuit affirmed this sentence as
reasonable.  Id.
    The disposition of Rashaw is scandalous and shameful.
Justice Scalia, for the majority of the Supreme Court, had
written in Blakely of an eerily similar hypothetical when making
a reductio ad absurdum argument refuting "[t]hose who would
reject Apprendi".  Blakely, 542 U.S. at 306.  That such an
appalling result can be "reasonable" under Remedial Booker speaks
volumes about the perversity of that decision in specific and of
"real conduct" sentencing in general.

constitutionally proven.[42] The system relies on "findings" that rest on "a mishmash of data[,] including blatantly self-serving hearsay largely served up by the Department [of Justice]." Green, 346 F. Supp. 2d at 280.[43] If the Sentencing Reform Act "depends for its success upon judicial efforts to" administer this scheme and its faux findings, then the Act's success ought not be desired. See Jones, 526 U.S. at 252 n.11 (Souter, J., for the Court) ("[I]t should go without saying that, if [sentencing] policies conflict with safeguards enshrined in the Constitution for the protection of the accused, those policies have to yield to the constitutional guarantees."). A fundamental premise of

---

[42]Dan Markel, "The Indispensable Berman on Booker", June 26, 2006, PrawfsBlawg, at http://prawfsblawg.blogs.com/prawfsblawg/2006/06/the_indispensab.html ("For what is real conduct in a regime in which the Founders sought the use of juries except conduct that has either been admitted to or been included in the indictment and proved to be 'real' beyond a reasonable doubt by a jury of one's peers?").

[43]Dan Markel, supra note 42 ("[W]hat makes the Booker remedy fundamentally untenable is that it continues to provide safe harbor for the imaginative fantasies of what really occurred under the rubric of real conduct."); see also Booker, 543 U.S. at 304 (Scalia, J., dissenting in part) (relating that judges "determine 'real conduct' on the basis of bureaucratically prepared, hearsay-riddled presentence reports"); Blakely, 542 U.S. at 312 (addressing the unfairness of basing a defendant's sentence "on facts extracted after trial from a report compiled by a probation officer who the judge thinks more likely got it right than got it wrong"). The Federal Public Defenders report that "[m]any (according to the Commission) or nearly all (in our experience) probation officers incorporate the prosecutor's written version of the facts or law enforcement reports directly into the [pre-sentence report]." Letter from Jon. M Sands, supra note 4, Memorandum at 21. Moreover, the Commission's own studies show wild inconsistencies in how probation officers evaluate "real conduct". Id. at 23.

46

our Constitution is that it is not what one "really" does that can be punished, but only that conduct which is proven at trial. The mandate of the United States Constitution is simple and direct:

> If the law identifies a fact that warrants deprivation of a defendant's liberty or an increase in that deprivation, such fact must be proven to a jury beyond a reasonable doubt.

See U.S. Const. art. III. § 2, cl. 3.

This rule has been articulated by the Supreme Court in essentially the same formula for over a century. See Davis v. United States, 160 U.S. 469, 493 (1895) ("No man should be deprived of his life under the forms of law unless the jurors who try him are able, upon their consciences, to say that the evidence before them . . . is sufficient to show beyond a reasonable doubt the existence of every fact necessary to constitute the crime charged." (Harlan, J., for a unanimous Court)); In re Winship, 397 U.S. 358, 364 (1970) ("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."); Apprendi, 530 U.S. at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); Ring, 536 U.S. at 602 ("If a State makes an increase in a defendant's authorized

47

punishment contingent on the finding of a fact, that fact -- no
matter how the State labels it -- must be found by a jury beyond
a reasonable doubt.").

The rule has three essential components: (1) every fact
necessary to punishment; (2) proved to a jury; (3) beyond a
reasonable doubt. Although the history and significance of every
component has been reviewed thoroughly by each significant case
on this issue, the importance of grasping these fundamental
concepts has never been greater -- nor their recognition less
secure. I feel impelled to write a few lines to address them yet
again.

### A.    Every Fact Necessary to Punishment

"The law threatens certain pains if you do certain things,
intending thereby to give you a new motive for not doing them.
If you persist in doing them, it has to inflict the pains in
order that its threats may continue to be believed." Oliver
Wendell Holmes, Jr., The Common Law 46 (Dover ed. 1991). It
follows from this that in order constitutionally to inflict those
"pains", the government must prove that one actually did those
"things". Anything less would make a farce of Due Process. As
Blackstone wrote,

> [T]he founders of the English laws have with excellent
> forecast contrived, that no man should be called to
> answer to the king for any capital crime, unless upon
> the preparatory accusation of twelve or more of his

48

fellow subjects, the grand jury: and that <u>the truth of every accusation</u>, whether preferred in the shape of indictment, information, or appeal, should afterwards be confirmed by the unanimous suffrage of twelve of his equals and neighbours, indifferently chosen, and superior to all suspicion.

4 Blackstone, <u>Commentaries on the Laws of England</u> 343 (1769) (emphasis added). This principle was recognized in an important aspect of the Supreme Court's decision in <u>In re Winship</u>, which applied its holding requiring proof beyond a reasonable doubt to "every fact necessary to constitute the crime". 397 U.S. 358, 364 (1970).

The Court's first ruling on the scope of that statement came in <u>Mullaney</u> v. <u>Wilbur</u> and took a broad, functional view of the matter. 421 U.S. 684 (1975). Maine law defined "murder" as "kill[ing] a human being with malice aforethought". <u>Id.</u> at 686 & n.3. The law provided a conclusive presumption of malice once the other elements were proven, unless the defendant proved by a preponderance of the evidence that he had acted in the heat of passion, which would reduce the offense to manslaughter. <u>Id.</u> The Supreme Court ruled that this scheme violated Due Process.

[T]he criminal law of Maine . . . is concerned not only with guilt or innocense in the abstract but also with the degree of criminal culpability. Maine has chosen to distinguish those who kill in the heat of passion from those who kill in the absence of this factor. Because the former are less blameworthy, they are subject to substantially less severe penalties. By drawing this distinction, while refusing to require the prosecution to establish beyond a reasonable doubt the fact upon which it turns, Maine denigrates the interests found critical in <u>Winship</u>.

49

Id. at 697-98 (alteration, citation, and internal quotation marks omitted). "If Winship were limited to those facts that constitute a crime as defined by state law, a State could undermine many of the interests that decision sought to protect without effecting a substantive change in its law." Id. at 698. "Winship is concerned with substance rather than this kind of formalism." Id. at 699.

The robust protections affirmed in Mullaney, however, were somewhat circumscribed two years later in Patterson v. New York. 432 U.S. 197 (1977). New York's homicide statute was similar to Maine's. It defined "murder" as "intentionally causing the death of anther person", see id. at 198, but provided a separate affirmative defense for those who "acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse." Id. Thus, the only difference between Maine's statute and New York's was that Maine's definition of murder included "malice" and New York's did not; New York did not employ a "presumption of malice" because malice was not part of the crime.

This distinction was significant to the Supreme Court. "The death, the intent to kill, and causation are the facts that the State is required to prove beyond a reasonable doubt if a person is to be convicted of murder. No further facts are presumed or inferred in order to constitute the crime." Id. at 205-06. "The State itself was unwilling to undertake to establish the absence

of [heat of passion] beyond a reasonable doubt . . . ." Id. at
207. "This view may seem to permit state legislatures to
reallocate burdens of proof by labeling as affirmative defenses
at least some elements of the crimes now defined in their
statutes. But there are obviously constitutional limits beyond
which the States may not go." Id. at 210. The Court limited
Mullaney's holding, saying that it "should not be so broadly
read" as to prohibit "the blameworthiness of an act or the
severity of punishment authorized for its commission to depend on
the presence or absence of an identified fact without assuming
the burden of proving the presence or absence of that fact, as
the case may be, beyond a reasonable doubt." Id. at 214. The
Court added that though "[t]here is language in Mullaney that has
been understood as perhaps construing the Due Process Clause to
require the prosecution to prove beyond a reasonable doubt any
fact affecting the degree of criminal culpability[,] . . . [t]he
Court did not intend Mullaney to have such far-reaching effect."
Id. at 214 n.15 (internal quotation marks and citation omitted).

The significant protections of Winship and Mullaney, then,
were to be had only when the criminal code was constructed in
such a way as to permit it. This might not have been such a
problem had criminal sentencing ossified around 1977 criminal
codes. Up to that point, all of the facts which the law
identified as significant to punishment, whether part of the
affirmative case or part of the defense, had been the subject of

51

the trial and found by the jury to exist or not.  In England, pre-revolutionary America, and for some time after our founding, the sentence imposed by the judge largely was non-discretionary and derivative wholly from the fact of conviction itself.  Toward the end of the nineteenth century, however, as rehabilitation became the primary objective of criminal justice, legislatures granted more discretion to judges (and to the executive through parole boards) to determine the exact length of a convicted defendant's sentence.  Importantly, the limits of such discretion always were fixed by statute.  Even in this discretionary system, the existence of facts necessary to the punishment provided by law were to be found in the very nature of the jury verdict.

In 1984, to rectify the disparity in sentences that had resulted from unchecked judicial and executive discretion, Congress passed the Sentencing Reform Act.  Pub. L. No. 98-473, 98 Stat. 1837 (codified as amended at 18 U.S.C. § 3551 et seq.). In addition to abolishing parole in the federal system, the Act also established the U.S. Sentencing Commission, whose primary mission was to create sentencing guidelines.  The most significant feature of the Guidelines, as promulgated, was the many "sentencing factors" it established.  These "factors" were the attempted codification of all those (legitimate) considerations that judges had used for decades when exercising their discretion in determining the length of a criminal sentence.  As noted previously, Guidelines "factors" were to be

52

found by the judge -- after the jury verdict -- and a sentence within the narrow range established by the Guidelines (and based on those findings) was essentially mandatory.[44]

The first case to consider the constitutionality of a sentencing scheme congruous with the Guidelines in important respects was McMillan v. Pennsylvania. 477 U.S. 79 (1986). In McMillan, the Supreme Court considered the implications of Pennsylvania's provision for a mandatory minimum sentence for a convicted felon if "the person 'visibly possessed a firearm' during the commission of the offense." Id. at 81 (citation omitted). Like the federal Guidelines, the fact of visible possession was to be found by the judge, after conviction, by a preponderance of the evidence. Id. McMillan challenged the procedure under the Due Process Clause as explicated in Winship and Mullaney.

Rejecting the challenge, the Supreme Court relied on Patterson. That case, said the Court, stood for the proposition that "the state legislature's definition of the elements of the offense is usually dispositive." Id. at 85. In the Pennsylvania statute, "the Pennsylvania Legislature has expressly provided that visible possession of a firearm is not an element of the crimes enumerated in the mandatory sentencing statute, but

---

[44]See generally Ilene H. Nagel, Structuring Discretion: The New Federal Sentencing Guidelines, 80 J. Crim. L. & Criminology 883 (1990).

53

instead is a sentencing factor." Id. at 85-86 (citation
omitted). It was here that the Court first identified -- and
validated -- these extra-verdict facts as "sentencing factors",
to be distinguished from "elements" of a crime. Laws such as
Pennsylvania's "operate ] solely to limit the sentencing court's
discretion in selecting a penalty within the range already
available to it without the special finding". Id. at 88. As to
Patterson's "constitutional limits beyond which the States may
not go", Patterson, 432 U.S. at 210, "the [Pennsylvania statute
at issue in McMillan] gives no impression of having been tailored
to permit the visible possession finding to be a tail which wags
the dog of the substantive offense." McMillan, 477 U.S. at 88
(emphasis added). And with that, the constitutional "limits"[45]
on the scope of "sentencing factors" were set.

The significant proposition of McMillan was that
legislatures could define "elements" of crimes and "sentencing
factors" largely as they wished. The practical effect of
endorsing this practice was to create a trial and sentencing
procedure which separated the lawful punishment from the jury

_____

[45]Justice Scalia later impugned this "standard" in a most-
amusing footnote. Blakely, 542 U.S. at 311 n.13 ("The source of
this principle [that tail shall not wag dog] is unclear. Its
precise effect, if precise effect it has, is presumably to
require that the ratio of sentencing-factor add-on to basic
criminal sentence be no greater than the ratio of caudal
vertebrae to body in the breed of canine with the longest tail.
Or perhaps no greater than the average such ratio for all breeds.
Or perhaps the median. Regrettably, Apprendi has prevented the
full development of this line of jurisprudence.").

54

verdict.  Unlike Mullaney and even Patterson, the sentence
imposed with schemes like that in McMillan was now dependent not
on the facts as found in the verdict, but on facts later found by
the judge.  Such a process forfeits significant constitutional
protections for criminal defendants in the finding of material
facts, including a sufficient standard of proof and jury fact-
finding.  Though supporters of McMillan would one day accuse the
proponents of Apprendi of engaging in "meaningless formalism",
Apprendi, 530 U.S. at 539 (O'Connor, J., dissenting), it is
actually McMillan that hews the formalistic line.[46]  Under its
rule, legislatures easily could draft their way around
constitutional protections by declaring relevant facts to be
"sentencing factors" instead of "elements" of a crime.
Protection like that is no protection at all.

It was fourteen years before the "historic link between
verdict and judgment", Apprendi, 530 U.S. at 482, began to be
restored.  In Apprendi, the Court returned to its early
functional approach regarding relevant facts: "Despite what
appears to us the clear 'elemental' nature of the [sentencing]
factor here, the relevant inquiry is not one of form, but of
effect -- does the required finding expose the defendant to a
greater punishment than that authorized by the jury's guilty
verdict?"  Id. at 494.  Citing Winship and Mullaney approvingly,

---

[46]Cf. Mullaney, 421 U.S. at 699 ("Winship is concerned with
substance rather than this kind of formalism.").

55

the Court resurrected the language of Mullaney that Patterson had rejected: "Since Winship, we have made clear beyond peradventure that Winship's due process and associated jury protections extend, to some degree, 'to determinations that [go] not to a defendant's guilt or innocense, but simply to the length of his sentence.' This was the primary lesson of Mullaney." Id. at 484 (quoting Almendarez-Torres, 523 U.S. at 251 (Scalia, J., dissenting)). "Criminal law 'is concerned not only with guilt or innocense in the abstract, but also with the degree of criminal culpability' assessed." Id. at 485 (quoting Mullaney, 421 U.S. at 697-98).[47]

Patterson and Mullaney were not necessarily contradictory in this regard -- only McMillan's broad reading of Patterson (later endorsed by the Apprendi dissenters) made it so. In both cases, all the facts the law deemed essential to guilt and punishment had been decided by the jury and were represented in the verdict. See id. at 485 n.12. Throwing cold water on McMillan, the Court limited its holding "to cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict -- a limitation identified in the McMillan opinion itself. . . . [W]e reserve for another day the question of whether stare decisis

---

[47]Justice O'Connor recognized -- and lamented -- the reinvigoration of Winship and Mullaney in her Apprendi dissent. 530 U.S. at 531-32.

considerations preclude reconsideration of its narrower holding."
Id. at 487 n.13. The Court did not "suggest that the term
'sentencing factor' is devoid of meaning. The term appropriately
describes a circumstance . . . that supports a specific sentence
within the range authorized by the jury's finding that the
defendant is guilty of a particular offense." Id. at 494 n.19.

This aspect of Apprendi caused the most consternation for
the dissenting Justices. Justice Breyer wondered, if there was
"no objection to traditional pre-Guidelines sentencing procedures
under which judges, not juries, made the factual findings that
would lead to an increase in an individual offender's sentence",
why "legislative determination[s] differ[ed] in any significant
way[.]" Id. at 561 (Breyer, J., dissenting). Justice O'Connor
expressed the same sentiment:

> Under our precedent . . . , a State may leave the
> determination of a defendant's sentence to a judge's
> discretionary decision within a prescribed range of
> penalties. When a judge, pursuant to that sentencing
> scheme, decides to increase a defendant's sentence on
> the basis of certain contested facts, those facts need
> not be proved to a jury beyond a reasonable doubt.  The
> judge's findings, whether by proof beyond a reasonable
> doubt or less, suffice for the purposes of the
> Constitution.  Under [Apprendi], however, it appears
> that once a legislature constrains judges' sentencing
> discretion by prescribing certain sentences that may
> only be imposed (or must be imposed) in connection with
> the same determinations of the same contested facts
> instead be proved to a jury beyond a reasonable doubt.
> I see no reason to treat the two schemes differently.

57

Id. at 546 (O'Connor, J., dissenting). Judge McConnell has identified this apparent anomaly as contributing to the contradiction of Booker. See McConnell, supra, at 679-80.

The dissenters missed the key point, however -- or refused to accept it. The law sets the range of available punishment. The facts relevant to constitutional protections are those which the law says stake out the bookends of this range, not those facts which the judge might consider in the exercise of his discretion within the range. "We have often noted that judges in this country have long exercised discretion of this [latter] nature in imposing sentence within statutory limits." Apprendi, 530 U.S. at 481 (citing Williams v. New York, 337 U.S. 241, 246, 247 (1949)).[48] Legislatures are free to set those limits where they like -- even to create a determinate, "real conduct" sentencing scheme, see Blakely, 542 U.S. at 308 -- but "[t]he historic link between verdict and judgment" constrains the judge's role in sentencing at its outer limits, id. at 482-83 & n.10. The facts deemed relevant by the law must be reflected in

---

[48]See Booker, 543 U.S. at 237 ("As it thus became clear that sentencing was no longer taking place in the tradition that Justice Breyer invokes, the Court was faced with the issue of preserving the ancient guarantee under a new set of circumstances. . . . And it is the new circumstances, not a tradition or practice that the new circumstances have superceded, that have led us to the answer first considered in Jones and developed in Apprendi and subsequent cases[,] culminating with this one. It is an answer not motivated by Sixth Amendment formalism, but by the need to preserve Sixth Amendment substance.").

58

the verdict. See id. at 481-82 & nn.9-10; id. at 478-79
("[A]fter the verdict . . . , 'the court must pronounce judgment,
which the law hath annexed to the crime.'" (emphasis added by the
Supreme Court) (quoting 4 Blackstone, supra, at 369-70)).
Blakely only clarified this point further. Its key holding --
the one that made certain the unconstitutionality of the federal
Guidelines -- was that "the relevant 'statutory maximum' is not
the maximum sentence a judge may impose after finding additional
facts, but the maximum he may impose without any additional
findings." Blakely, 542 U.S. at 303-04 (first emphasis added).
Thus, "the 'statutory maximum' for Apprendi purposes is the
maximum sentence a judge may impose solely on the basis of the
facts reflected in the jury verdict". Id. at 303.

The lesson of the Supreme Court's most recent jurisprudence,
therefore -- Remedial Booker notwithstanding -- is that every
fact which the law identifies as relevant to guilt or punishment
has heightened, constitutional significance. Apprendi, 530 U.S.
at 494 ("[T]he relevant inquiry is not one of form, but of effect
-- does the required finding expose the defendant to a greater
punishment than that authorized by the jury's guilty verdict?").
These facts must be represented in the verdict. Call them what
you want -- elements, factors, or reasonableness criteria; if the
existence of certain facts identified by the law is to affect the
defendant's sentence, then the Constitution provides procedural
protections to the defendant in the finding of those facts.

59

These procedural protections consist of those additional aspects
of the rule to which I now turn.

## B.    Proved to a Jury

This Court has written on the virtues of the American jury
in both civil and criminal contexts for nearly two decades.[49]  I
take the opportunity to do so again here because there is no
other proceeding in which the jury's role is more fundamental
than a criminal trial.

Blackstone wrote that "[s]ome authors have endeavoured to
trace the origin[] of juries up as high as the Britons
themselves, the first inhabitants of our island; but certain it
is, that they were in use among the earliest Saxon colonies". 3
Blackstone, supra, at 349.[50]  Blackstone considered trial by jury

[49]See, e.g., EIU Group, Inc. v. Citibank Del., Inc., 429 F.
Supp. 2d 367 (D. Mass. 2006); Delaventura v. Columbia Acorn
Trust, 417 F. Supp. 2d 147 (D. Mass. 2006); In re Relafen
Antitrust Litig., 231 F.R.D. 52 (D. Mass. 2005); Enwonwu v.
Chertoff, 376 F. Supp. 2d 42, 78-85 (D. Mass. 2005); Miara v.
First Allmerica Fin. Life Ins. Co., 379 F. Supp. 2d 20, 69 n.57
(D. Mass. 2005); United States v. Green, 346 F. Supp. 2d 259 (D.
Mass. 2004); Berthoff v. United States, 140 F. Supp. 2d 50, 61-95
(D. Mass. 2001); Ciulla v. Rigny, 89 F. Supp. 2d 97, 102 n.7 (D.
Mass. 2000); Lirette v. Shiva Corp., 27 F. Supp. 2d 268, 271 n.3
(D. Mass. 1998); Andrews-Clark v. Travelers Ins. Co., 984 F.
Supp. 49, 63 n.74 (D. Mass. 1997); In re Acushnet River & New
Bedford Harbor, 712 F. Supp. 994 (D. Mass. 1989); see also
William G. Young, Vanishing Trials, Vanishing Juries, Vanishing
Constitution, Suffolk L. Rev. (forthcoming Fall 2006); William G.
Young, An Open Letter to U.S. District Judges, Fed. Law., July
2003, at 30-35.

[50]The Apprendi dissenters faulted the majority for citing
the third volume of the Commentaries, which deals with private

"the glory of the English law." Id. at 379. In 1215, trial by jury was significant enough to have been specifically protected in the Magna Carta -- "more than once insisted on as the principal bulwark of our liberties". Id. at 350.[51]

    This significance was not lost on American colonists. As Professor Akhil Reed Amar explains,

> [L]ate-eighteenth-century America placed great faith in her juries, civil and criminal, grand and petit. Before 1776, colonial jurors had stood shoulder to shoulder with colonial assemblymen to defend American self-governance against a formidable alliance of unrepresentative imperial officers and institutions . . . . In the 1760s and 1770s, Americans used [juries] to assail imperial policies and shield patriot practices. In response, British authorities tried to

---

wrongs, as opposed to the fourth volume, which deals with public wrongs. See 530 U.S. at 525-26 (O'Connor, J., dissenting). Ably parrying this petty thrust, the majority correctly pointed out that "Blackstone himself directs us to [the third volume] for these purposes." Id. at 479 n.6 (quoting 4 Blackstone, supra, at 343 ("The antiquity and excellence of this trial [by jury], for the settling of civil property, has before been explained at large. And it will hold much stronger in criminal cases . . . .")); see also 3 Blackstone, supra, at 379 ("And, if [trial by jury] has so great an advantage over others in regulating civil property, how much must that advantage be heightened, when it is applied to criminal cases!").

[51]See also 3 Blackstone, supra, at 379 ("[Trial by jury] is the most transcendent privilege which any subject can enjoy[] or wish for, that he cannot be affected either in his property, his liberty, or his person, but by the unanimous consent of twelve of his neighbours and equals. A constitution, that I may venture to affirm has, under providence, secured the just liberties of this nation for a long succession of ages. And therefore a celebrated French writer [Montesque], who concludes, that because Rome, Sparta, and Carthage have lost their liberties, therefore those of England in time must perish, should have recollected that Rome, Sparta, and Carthage, were strangers to the trial by jury.").

divert as much judicial business as possible away from
American juries . . . .   Revolted, Americans revolted.

Akhil Reed Amar, <u>America's Constitution: A Biography</u> 233 (2005)

[hereinafter, Amar, <u>Constitution</u>].[52]  Among the "causes which

impel[led] them to the separation" listed in the Declaration of

Independence was that King George had "depriv[ed] [Americans] in

many cases[] of the benefit of Trial by Jury" and had

"transport[ed] [them] beyond Seas to be tried for pretended

offenses".   <u>The Declaration of Independence</u> paras. 1, 20, 21

(U.S. 1776).[53]

Respect for the jury continued thereafter, as evidenced by

the fact that "the only right secured in all state constitutions

penned between 1776 and 1787 was the right to trial by jury in

criminal cases."   Amar, <u>Bill of Rights</u>, <u>supra</u>, at 83.   Likewise,

---

[52]This recent book by Professor Amar has been called "the
second best book ever written about the U.S. Constitution" -- an
"amazingly, almost disturbingly close second" only to <u>The
Federalist</u>.   Michael Stokes Paulsen, <u>How To Interpret the
Constitution (and How Not To)</u>, 115 Yale L.J. 2037, 2038 (2006);
<u>see also</u> Scott Turow, <u>Everything Is Illuminated</u>, Wash. Post,
Sept. 25, 2005, at BW03 ("It is . . . an uncommonly engaging work
of scholarship and deserves to be valued as such."); Gordon S.
Wood, <u>How Democratic Is the Constitution</u>, N.Y. Rev. Books, Feb.
23, 2006, at 25, 25-27 ("[A]s a reference book, it is superb.   It
is, so far as I know, the fullest and most reliable explanation
of the written Constitution that we have.").

[53]<u>See also</u> Akhil Reed Amar, <u>The Bill of Rights</u> 83 (1998)
[hereinafter, Amar, <u>Bill of Rights</u>] (noting that "these words, in
turn, built on the 1774 Declaration of Rights of the First
Continental Congress -- 'the respective colonies are entitled to
. . . the great and inestimable privilege of being tried by their
peers of the vicinage' -- and the 1775 Declaration of the Causes
and Necessity of Taking Up Arms affirming the 'inestimable
privilege of trial by jury.'").

62

when, in 1789, attention turned to the drafting and ratification
of our present Constitution, juries were at the fore.  The
Philadelphia document did provide that "[t]he Trial of all Crimes
. . . shall be by Jury . . . ",  U.S. Const. art. III, § 2, cl.
3, but much discussion was centered around the lack of provision
for civil juries, see generally EIU Group, Inc., 429 F. Supp. 2d
at 381-82.  The debate confirms early-American veneration for the
jury as an institution.  Alexander Hamilton, writing as Publius,
described this sentiment: "The friends and adversaries of the
plan of the convention, if they agree in nothing else, concur at
least in the value they set upon the trial by jury: Or if there
is any difference between them, it consists in this; the former
regard it as a valuable safeguard to liberty, the latter
represent it as the very palladium of free government."  The
Federalist No. 83 (Alexander Hamilton).  To allay Anti-Federalist
concerns that the Constitution was not protective enough,
"[j]uries, guaranteed in no fewer than three amendments, were at
the heart of the Bill of Rights."  Amar, Bill of Rights, supra,
at 83.

    These concerns were born of an astute, practical
understanding of government power and its exercise.  The court
system is where government policy is imposed on individual
people, and juries historically are the last popular hurdle the
government must clear before that imposition.  In a very tangible
sense, then, "[t]he great object of a trial by jury in criminal

63

cases is[] to guard against a spirit of oppression and tyranny on
the part of the rulers". Joseph Story, 3 Commentaries on the
Constitution § 1774, at 653 (Rothman & Co. ed. 1991); see also 3
Blackstone, supra, at 350. Colonial Americans were all-too-
familiar with the necessity of this protection. Professor Rachel
E. Barkow recounts one of the most notable episodes:

> In 1734, the royal governor in New York sought to
> punish [John Peter] Zenger for publishing criticism of
> the administration. After three grand juries refused
> to indict Zenger, the governor prosecuted him on the
> basis of an "information." At the trial, Zenger's
> lawyer argued that the petit jurors "ha[d] the right,
> beyond all dispute, to determine both the law and the
> fact" and could conclude that the truth of Zenger's
> criticisms could be the basis of an acquittal, even
> though the law on the books stated that truth was not a
> defense to libel. The jurors used their power to
> return a general verdict to acquit. The case was
> highly publicized; an account of the trial was produced
> in pamphlet form and widely circulated throughout the
> colonies. It "impressed thousands of Americans with
> the importance of the right to jury as a bulwark
> against official oppression" and "revolutionized
> America." It was one of many cases in which a jury
> essentially nullified the law of seditious libel, and
> it demonstrated the jury's power to decide cases based
> on its notions of fundamental law.

Rachel E. Barkow, Recharging the Jury: The Criminal Jury's
Constitutional Role in an Era of Mandatory Sentencing, 152 U. Pa.
L. Rev. 33, 52 (2003) (footnotes omitted, second alteration in
original); see also Amar, Bill of Rights, supra, at 84-88.

It is clear beyond peradventure that what the Founders had
in mind by protecting criminal juries was the protection of the
people's ability to continue so to rule. See Barkow, supra at
46-84. Taken in combination, the jury's widely accepted power to

64

issue a general verdict, if an acquittal, together with the Fifth

Amendment's Double Jeopardy Clause, creates the possibility of an

absolute veto by the people before the government can succeed in

attaching the label "criminal" to any defendant. See id. at 48-

50; Amar, Bill of Rights, supra, at 96-98. One variation on this

theme was known, at common law, as "pious perjury", in which the

jury would convict on some lesser-included offense even though

the evidence supported the more serious charge. See 4

Blackstone, supra, at 238-39, 354; see also Apprendi, 530 U.S. at

479 n.5 (citing Blackstone); Jones, 526 U.S. at 245 (same). The

primary function of this practice related to sentencing.

Because, "[a]t common law, the substantive criminal law tended to

be sanction-specific", jurors possessed a "de facto sentencing

function". Barkow, supra, at 70-71 (internal quotation marks

omitted). As Professor Barkow reports,

> In his study of juries in England from 1200 to 1800,
> Thomas Green found that jurors consistently acquitted
> defendants of capital charges and convicted on lesser
> charges because they believed the laws to be too harsh
> as applied to the defendant. In another example, John
> Langbein reports that, in eighteenth-century England,
> the jury not only decided guilt, but it chose the
> sanction through its manipulation of the partial
> verdict. Thus, jurors would downgrade from grand to
> petty larceny if the goods were of relatively small
> value or if the jury sympathized with the defendant.

Id. at 79 (internal quotation marks, alteration, and footnotes

omitted) (citing Thomas Andrew Green, Verdict According to

Conscience: Perspectives on the English Criminal Trial Jury 1200-

1800 28-64, 261, 269, 360 (1985); John H. Langbein, Shaping the

Eighteenth-Century Criminal Trial, 50 U. Chi. L. Rev. 1, 55
(1983)). The Supreme Court has endorsed this view of the
criminal jury. See Blakely, 542 U.S. at 306 (referring to the
jury's role "as circuit breaker in the State's machinery of
justice").

Historical reasons to one side (though those would be
sufficient), this Court does not rest its affirmative case for
American criminal juries on their nullification power. Indeed,
this Court -- as do most -- emphatically instructs jurors that,
on their oaths as jurors, they must follow the law as the Court
teaches it to them. Although juries, through their general
verdict, have the raw power not to follow the law in its
application to the facts, this usually is not something to be
exalted. The power to act lawlessly to a defendant's benefit is
also the power to act lawlessly to his detriment. Granted, in
colonial America, jury nullification was a vaunted tool of
patriots and, as such, effectively was protected in the
Constitution. "[T]o some extent," however, "the centrality of
the jury as late as 1789 may have reflected lessons from the
past". Amar, Bill of Rights, supra, at 109. "Once American
legislatures had wrested control from Parliament and federal
judges had won life tenure and other attributes of independence,

perhaps juries would not need to carry all the load they had
borne before . . . ."  Id. at 110.[54]

Perhaps not all the load, but still an important share.  The
theory behind the central role of the American jury in the
exercise of judicial power still has extraordinary relevance
today.  Enwonwu, 376 F. Supp. 2d at 80-81.  Before the jury's
continuing importance adequately can be explained, however, one
must understand the jury's structural role in the Constitution.

Historian Herbert J. Storing writes, "The question was not
fundamentally whether the lack of adequate provision for jury
trial would weaken a traditional bulwark of individual rights
(although that was also involved) but whether it would fatally
weaken the role of the people in the administration of
government."  Amar, Bill of Rights, supra, at 94 (internal
quotation marks omitted) (quoting Herbert J. Storing, What the
Anti-Federalists Were For 19 (1981)); see also id. at 94 n.43
(citing and quoting other sources, including Blackstone and John

_____

[54]Explaining this belt-and-suspenders approach, Professor
Amar continues, "But could Americans in 1789 be sure that a small
and newfangled Congress would never become as aloof and distant
as Parliament had been, or that federal judges seeking power and
promotions would never abet a grasping executive?  Abiding
ideologies of liberty and ingrained patterns of thought and
action do not die overnight.  Thus when Federalists proposed to
summon up a new and awesome imperial government to stand in the
shoes of the ousted British king, many suspicious Americans
instinctively reached for their trusty ideological weapons,
without asking whether those weapons had been crafted to win the
last war, rather than the next one."  Amar, Bill of Rights,
supra, at 110.

67

Hancock). As Professor Amar has argued, the jury's structural role, therefore, is significant: It is the people's voice in the judiciary. Amar, Bill of Rights, supra, at 94-96; Amar, Constitution, supra, at 236-37.

> In effect, each of the three branches of the federal
> government featured bicameral balance. In the
> legislature, members of Congress's lower house -- more
> numerous than senators, more localist, with shorter
> terms of office and more direct links to the electorate
> -- would counterbalance the members of the upper house.
> In the executive branch, local citizen militias would
> counterbalance the central government's professional
> soldiers, and local citizen grand jurors would
> counterbalance the central government's professional
> prosecutors. So, too, within the judiciary, trial
> jurors would counterbalance trial judges.

Amar, Constitution, supra, at 237. Unorthodox as this conception may seem to modern Americans, who feel that branches of their government becoming ever more distant, Professor Amar has it right.

> The Federal Farmer put it well:

> It is essential in every free country, that common
> people should have a part and a share of influence[] in
> the judicial as well as in the legislative department.
> . . . The trial by jury in the judicial
> department[] and the collection of the people by their
> representatives in the legislature . . . have procured
> for them, in this country, their true proportion of
> influence, and the wisest and most fit means of
> protecting themselves in the community. Their
> situation, as jurors and representatives, enables them
> to acquire information and knowledge in the affairs and
> government of the society; and to come forward, in
> turn, as the [s]entinels and guardians of each other.

Amar, Bill of Rights, supra, at 94-95 (first and second alteration in original) (quoting Letters from the Federal Farmer

68

(IV), reprinted in 2 The Complete Anti-Federalist 249-50 (Herbert J. Sorting ed. 1981)). Contemporary references of this sort abound. See id. at 95 ("[T]he Maryland Farmer defined the jury as 'the democratic branch of the judiciary power -- more necessary than representatives in the legislature.' So too, the Anti-Federalist Hamden described 'trial by jury' as 'the democratical balance in the Judiciary power' . . . ."). Thomas Jefferson remarked that "it is necessary to introduce people into every department of government . . . . Were I called upon to decide whether the people had best be omitted in the Legislative or Judicial department, I would say it is better to leave them out of the Legislative." Id. (alteration in original, internal quotation marks omitted) (quoting Letter from Thomas Jefferson to L'Abbé Arnoux (July 19, 1789), in The Papers of Thomas Jefferson 282, 283 (Julian P. Boyd ed. 1958)). Writing some years later, the famous anthologist of all things American, Alexis de Tocqueville, summed it up: "The jury is, above all, a political institution [not merely judicial], and it must be regarded in this light in order to be duly appreciated." 1 Alexis de Tocqueville, Democracy in America 282 (Vintage Books ed. 1990).

The Supreme Court in Blakely unmistakably adopted this conception of the jury's role in the constitutional structure. It wrote, "Our commitment to Apprendi in this [guidelines] context reflects . . . the need to give intelligible content to the right of jury trial. That right is no mere procedural

69

formality, but a fundamental reservation of power in the constitutional structure.  <u>Just as suffrage ensures people's</u> <u>ultimate control in the legislative and executive branches, jury</u> <u>trial is meant to ensure their control in the judiciary."</u> <u>Blakely</u>, 542 U.S. at 305-06 (emphasis added); <u>see also</u> <u>Powers</u> v. <u>Ohio</u>, 499 U.S. 400, 406 (1991) ("The opportunity for ordinary citizens to participate in the administration of justice has long been recognized as one of the principle justifications for retaining the jury system."). That the jury be allowed to serve in its sentencing role is no less a part of Article III than it is of the Sixth Amendment. <u>See</u> Jackie Gardina, <u>Compromising</u> <u>Liberty: A Structural Critique of the Sentencing Guidelines</u>, 30 U. Mich. J.L. Reform 345, 374-88 (2005).

Far from mere theoretical aspirations, this "popular" conception of the judiciary yields practical benefits. As this Court has written in the context of civil juries, "All of our rules of law purport to be based on the collective values of the community." <u>Acushnet River</u>, 712 F. Supp. at 1005. "[T]he jury achieves symbolically what cannot be achieved practically -- the presence of the entire populace at every trial." P. DiPerna, <u>Juries on Trial</u> 21 (1984). "Like all government institutions, our courts draw their authority from the will of the people to be governed. The law that emerges from these courts provides the threads from which all our freedoms are woven. It is through the rule of law that liberty flourishes. Yet, there can be no

70

universal respect for the law unless all Americans feel that it
is their law.  Through the jury, the citizenry takes part in the
execution of the nation's laws, and in that way each can rightly
claim that the law partly belongs to her."  Acushnet River, 712
F. Supp. at 1005 (internal quotation marks and citation omitted).

    This applies all the more to criminal conviction and
incarceration -- the most grave action a government can take
against an individual.  "The jury adds a unique perspective to
the criminal justice system: the views of the community."
Barkow, supra, at 77.  "In a very real sense . . . a jury verdict
actually embodies our concept of 'justice.'"  Acushnet River, 712
F. Supp. at 1005.  More than that, under the theory articulated
by Professor Amar and endorsed by the Supreme Court, the criminal
jury is a constitutional necessity.  The criminal jury is not
simply a machine into which we insert data and out of which come
"facts" for judges' use in legal rulings.  It is also -- and more
importantly -- an independent source of power in our
constitutional system.  Excluding juries from determinations
affecting a defendant's liberty is no less offensive to the
Constitution than enacting a revenue bill without approval of the
House of Representatives, ratifying a treaty without a vote of
the Senate, or seating a judge without the President's
nomination.

    Realizing the significant structural role of the jury, we
can return to the question of its continued functional

71

significance. The mere fact that a <u>jury</u> reached a particular

decision lends moral force to that decision -- much more than if

it were reached solely by a judge. As Professor Amar writes of

the Boston Massacre trials, in which the British soldiers

(represented by John Adams) were acquitted on most charges,

"the[] [jury] verdicts carried special legitimacy precisely

because local juries had made the decisions, after open trials

that could be easily monitored by the victims' friends and

families and Bostonians more generally." Amar, <u>Constitution</u>,

<u>supra</u>, at 237. Judicial actions, therefore, acquire their

legitimacy under our Constitution by having been vetted and

approved by an American jury.[55] Quite apart from nullification,

---

[55]The jury decision's moral force, derived from the popular
constitution of that body, is not the only advantage of such a
system. The fact is that juries are more likely to reach the
correct decision. Just as nine judges are better than three when
expounding the law, twelve heads are better than one when it
comes to the review and weighing of often-murky evidence
resulting in an ultimate finding of fact. James Wilson, a
Pennsylvania delegate to the constitutional convention put it
well:

> [Trial by jury] has excellencies that entitle it to a
> superiority over any other mode . . . . Where jurors
> can be acquainted with the characters of the parties[]
> and the witnesses, where the whole cause can be brought
> within their knowledge and their view, I know no mode
> of investigation equal to that by a jury; they hear
> everything that is alleged; they not only hear the
> words, but they see and mark the features of the
> countenance; they can judge of the weight due to such
> testimony . . . .

James Wilson's Summation and Final Rebuttal at the Pennsylvania
Ratifying Convention (Dec. 11, 1787), <u>in</u> 1 <u>Debate on the
Constitution</u> 832, 854-55 (Bernard Bailyn ed., 1993). Blackstone
likewise praised the jury's truth-seeking abilities. <u>See</u> 3
Blackstone, <u>supra</u>, at 355 ("[O]bserve . . . how admirably [trial

juries serve an important structural function by bolstering the credibility and popular appeal of the judiciary. Though creating an independent judiciary may have assuaged the need for jury nullification of executive power run amok, only the most closed-minded imperialists of executive and congressional power would denigrate the necessity of the judiciary to check those branches in appropriate cases. Today's juries serve to sustain judicial independence and legitimize the power exercised by the third branch when it is necessary to do so. As I have written previously, "[o]nly because juries may decide most cases is it tolerable that judges decide some." William G. Young, "An Open Letter to Federal Judges", Fed. Law., July 2003, at 30.

In the modern political climate, the judiciary is under mounting criticism and the Congress increasingly uses tactics that restrict the judiciary's proper function.[56] Justices O'Connor and Breyer valiantly and regularly have come to the

---

by jury] is adapted and framed for the investigation of truth, beyond any other method of trial in the world."). Trial by jury "is, quite simply, the best we have." In re Acushnet River, 712 F. Supp. at 1005.

[56]Various members of Congress have called for the impeachment of judges for rulings with which they disagree, have proposed to strip courts of jurisdiction over certain issues, to cut court budgets in retaliation, to call judges before congressional committees to explain their rulings, and to prohibit the executive from enforcing judicial decisions. See Judiciary Under Fire, The Fresno Bee, Apr. 16, 2005, at B8. Most recently, on July 19, the House of Representatives approved a bill removing jurisdiction from federal courts in cases involving the Pledge of Allegiance. See Pledge Protection Act of 2005, H.R. 2389, 109th Cong. (2006).

defense of judicial independence[57]; but their views, as expressed
in Apprendi and Blakely and which were triumphant in Remedial
Booker, play directly into the hands of those who conspire
against "unelected judges". As the people's representatives in
the judicial branch, juries bring a popular legitimacy to
judicial acts. Minimizing their role, as did Remedial Booker,
only serves to weaken the judiciary further against these
attacks. There is no better way to protect the power of the
judiciary than to give it away to the people -- to our juries.

These sentiments apply with especial force in the area of
criminal sentencing. The aggrandizement of executive power which
the Guidelines enabled is now generally recognized by all
thoughtful observers. See Green, 346 F. Supp. 2d at 263-89
(citing many sources); Gardina, supra, at 358-69. Post-Booker
circuit court decisions, overwhelmingly favorable to government

---

[57]Justice O'Connor gave a notable speech on the topic on
March 6, 2006, at Georgetown University, reported by National
Public Radio's Nina Totenberg. At http://www.npr.org/templates/
story/story.php?storyId=5255712. Justice O'Connor gave a
similarly themed speech in November 2005 at the American Academy
of Appellate Lawyers, the text of which is available at
http://www.appellateacademy.org/events/oconnor_remarks_
110705.pdf.

The late Chief Justice Rehnquist also devoted an entire
section of his last Year-End Report to the problem of political
attacks on judges. See Chief Justice William H. Rehnquist, 2004
Year-End Report on the Federal Judiciary 4-8 (Jan. 1, 2005)
("Although arguments over the federal Judiciary have always been
with us, criticism of judges, including charges of activism have
in the eyes of some taken a new turn in recent years."),
available at http://www.supremecourtus.gov/publicinfo/year-end/
2004year-endreport.pdf.

74

appeals, see supra note 36, have shown that not much has changed. The executive is still in the pilot seat with regard to the determination of criminal sentences. Even with "advisory" Guidelines, judges are "limited by appellate review. . . . The jury, in contrast, . . . faces no review by a court or legislature. It therefore has greater opportunity than a judge to check the state . . . ." Barkow, supra, at 60-61 (internal quotation marks and footnotes omitted). A return to "[t]he historic link between verdict and judgment" as commanded by Apprendi, 530 U.S. at 482, would do much to restore the proper balance among the branches in criminal sentencing and would, as well, enhance the general legitimacy of judicial acts.


## C.   Beyond a Reasonable Doubt

A summary of this aspect of the rule starts where all criminal courts start: the presumption of innocence. In Coffin v. United States, the Supreme Court cited sources speculating that the presumption of innocence dates from the time of Moses, as recorded in the Book of Deuteronomy, and "was substantially embodied in the laws of Sparta and Athens." 156 U.S. 432, 454 (1895). Expressing no view on this ancient pedigree, the Court wrote, however, that "there can be no question that the Roman law was pervaded with the results of this maxim of criminal administration". Id. "The principle that there is a presumption

75

of innocence in favor of the accused is the undoubted law,
axiomatic and elementary, and its enforcement lies at the
foundation of the administration of our criminal law." Id. at
453.

To begin by recognizing the presumption of innocence is
essential when discussing the standard of proof, lest the
discussion become unmoored from its purpose. For, the
presumption of innocence is guarded in large measure by the
standard of proof necessary to overcome it. See Anthony A.
Morano, A Reexamination of the Development of the Reasonable
Doubt Rule, 55 B.U. L. Rev. 507, 509 (1975).[58]

The standard, like the presumption, also is said to have
biblical roots. Blackstone repeated the familiar phrase that
"the law holds[] that it is better that ten guilty persons
escape, than that one innocent suffer." 4 Blackstone, supra, at
352.[59] The earliest authorities indicate that the original

---

[58]See also Coffin, 156 U.S. at 456 (quoting McKinley's Case,
33 State Tr. 275, 306 (1817) ("[T]he presumption in favor of
innocen[s]e is not to be redargued by mere suspicion. I am sorry
to see, in this information, that the public prosecutor treats
this too lightly; he seems to think that the law entertains no
such presumption of innocen[s]e. I cannot listen to this. I
conceive that this presumption is to be found in every code of
law which has reason and religion and humanity, for a foundation.
It is a maxim which ought to be inscribed in indelible characters
in the heart of every judge and juryman . . . . To overturn
this, there must be legal evidence of guilt, carrying home a
decree of conviction short only of absolute certainty.")).

[59]The exact number of guilty persons society will tolerate
at liberty so as to protect the innocent is a matter of some
debate. See Coffin, 156 U.S. at 455-56 (quoting Fortesque,

76

standard "closely approximated absolute certainty". Morano, supra, at 511. With "[t]he [i]nfusion of [r]eason into the [l]aw" in the late seventeenth century, however, only the absence of "reasonable" doubt as to a defendant's guilt was necessary to support a conviction. Id. at 513-15. Though this development "had the effect of reducing the prosecutor's burden of proof in criminal trials", new rules of evidence had also "limited the prosecutor's ability to present information to the jury and thereby made it more difficult to prove the defendant's guilt beyond any doubt." Id. at 514. The reasonable doubt standard, then, "restore[d] the balance between the defendant and the prosecutor." Id. at 515. In any event, reason is now such an integral and accepted part of the law that it is hardly necessary to justify the marginally lesser prosecutorial burden.

The Supreme Court in Apodaca v. Oregon retailed the common belief that the first use of the reasonable doubt standard was in

---

saying that "one would much rather that twenty guilty persons should escape punishment of death than that one innocent person should be condemned and suffer capitally", as well as Lord Hale, saying that "it is better five guilty persons should escape unpunished than one innocent person should die"). The issue also has received the attention of more omnipotent parties than the Supreme Court. See Genesis 18:22-32 (relating the discussion between God and Abraham over the destruction of Sodom, in which Abraham extracts concessions from God that He will not destroy the city if 50, then 45, 40, 30, 20, and finally only 10 righteous people are found therein). Though the question will not today be answered with any more exactitude, the principle sought is clear enough.

Dublin, Ireland, in 1798. 406 U.S. 404, 412 n.6 (1972).[60]
Professor Morano's own analysis, however, concludes that the
first recorded use of the reasonable doubt standard was here in
Boston during the second of the Boston Massacre Trials in 1770,
Rex v. Wemms. Morano, supra, at 516-19. Countering John Adams's
argument that the jury should acquit the British soldiers "if you
doubt of the prisoner's guilt", Robert Treat Paine argued instead
that "if the Evidence be sufficient to convince you of their
Guilt beyond a reasonable Doubt[,] the Justice of the Law will
require you to declare them Guilty." Id. at 517 (emphasis added)
(quoting the account relayed in 3 L. Wroth & H. Zobel, Legal
Papers of John Adams (1965)). Despite scattered pre-
revolutionary application of the standard, judicial acceptance
was not solidified until the late nineteenth century. Widespread
use of it by courts likely existed decades earlier, though.
Morano, supra, at 519-24.

    The standard became relevant to the present discussion with
the Supreme Court's holding in In re Winship, which made the use
of the reasonable doubt standard integral to Due Process. 397
U.S. 358, 364 (1970). Though it had never explicitly so ruled
prior to that case, the Court did note that the necessity for

_____

[60]Professor Morano attributes this theory to an article
written by Judge John Wilder May in 1876. Morano, supra, at 515
(citing May, Some Rules of Evidence: Reasonable Doubt in Civil
and Criminal Cases, 10 Am. L. Rev. 642 (1876)). Both Wigmore and
McCormick accepted this account. Id.

such a standard had "long been assumed". Id. at 362 (citing
cases as far back as 1895). In adopting it, the Court noted that
the reasonable doubt standard "plays a vital role in the American
scheme of criminal procedure" and that "[i]t is a prime
instrument for reducing the risk of convictions resting on
factual error." Id. at 363.

A high standard addresses the significant concerns of the
two beneficiaries of justice: the defendant and society. First,
the Supreme Court agreed with the dissenters in the court below
that "a person accused of a crime . . . would be at a severe
disadvantage, a disadvantage amounting to a lack of fundamental
fairness, if he could be adjudged guilty and imprisoned for years
on the strength of the same evidence as would suffice in a civil
case." Id. (alteration in original, internal quotation marks
omitted). "[T]he reasonable-doubt standard is indispensable"
because it reduces the margin of error of wrongly depriving a
defendant of his liberty -- "an interest of transcending value".
Id. at 364 (internal quotation marks omitted). Second, the
reasonable doubt standard is "indispensable to command the
respect and confidence of the community in applications of the
criminal law. It is critical that the moral force of the
criminal law not be diluted by a standard of proof that leaves
people in doubt whether innocent men are being condemned. It is
also important in our free society that every individual going
about his ordinary affairs have confidence that his government

79

cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty." Id. at 364.

These interests are no less relevant or important today than they were in 1970. Nor is the protection afforded by the reasonable doubt standard less applicable to the determination of Guidelines enhancement facts than to factual determinations of guilt. The revival of Mullaney's functional framework, see supra Part III.A, supports this conclusion. See infra Part IV.B.3; cf. Winship, 397 U.S. at 365-68 (applying reasonable doubt standard to factual determinations in a juvenile delinquency proceeding).

## IV.  The Court Prepares for Trial

Traversing the legal landscape limned above is difficult -- particularly since the transitory heat haze so frequently obscures the constitutional bedrock. Of course, as a trial judge, I must obey the commands of both the Supreme Court and the First Circuit. I do -- but it isn't easy.

By Spring of 2004, having read William J. Trach's note in the Harvard Law Review[61], I became convinced that the federal mandatory Guidelines were unconstitutional. I began to work up my analysis, which was eventually released in an opinion on June

---

[61]Note, The Unconstitutionality of Determinate Sentencing in Light of the Supreme Court's "Elements" Jurisprudence, 117 Harv. L. Rev. 1236 (2004).

18, 2004, styled <u>United States</u> v. <u>Green</u>, 346 F. Supp. 2d 259 (D. Mass. 2004); six days later, I naturally was pleased when <u>Blakely</u> v. <u>Washington</u>, 542 U.S. 296 (2004), confirmed this analysis. A trial judge cannot afford the luxury of waiting for an appellate decision on every issue of constitutional moment, however, and it is the responsibility of every judicial officer to correct an unconstitutional procedure just as soon as he becomes convinced of its unconstitutionality. Therefore, that spring, the Court already had altered its standing procedures for handling trials and taking pleas.[62]

## A.   The Court's Initial Standing Procedure: "<u>Blakely</u>-izing" the Guidelines

At the initial criminal case management scheduling conference, the Court inquires of the government what, if any, enhancements it will seek should the defendant be convicted.  The Court then informs all parties that the government must prove such enhancements to the jury at the trial beyond a reasonable doubt pursuant to the Federal Rules of Evidence.  <u>But see</u> <u>infra</u> Parts IV.B.1 & IV.B.3.  If, after deliberation, the jury finds the defendant guilty of the charged crime, it is also (on the same verdict form) asked whether the government has proven the

---

[62]As this session of the Court had these procedures in place even before the <u>Blakely</u> decision was announced, the bar called this "<u>Apprendi</u>-izing" the Guidelines.  <u>See</u> Gregory I. Messing, United States v. Booker <u>and a Meaningful Role for the Jury</u>, 90 Mass. L. Rev. 10, 18 n.107 (2006).

81

Guidelines enhancement facts. The jury is instructed to use the same reasonable doubt standard as to these facts. As a corollary, when taking a plea, the Court carefully reminds the defendant that he has a right to a jury trial on any disputed enhancement and that it is the policy of the Court still to confer the Guidelines' discount for a plea should the government fail to meet its burden of proof as to that enhancement. In either event, the Court initially considered itself bound by the jury's findings. But see infra Parts IV.B.1 & IV.B.2. The defendant may, of course, waive the proffered jury trial as to any enhancement, in which case a jury-waived trial as to the enhancement will follow the main jury trial or the plea. The burden of proof at such trial similarly was beyond a reasonable doubt upon a record of evidence admissible under the Federal Rules of Evidence.

There's nothing original about any of this. It was (and remains) the logical response to Blakely. Immediately after that decision, the Office of the United States Attorney for the District of Massachusetts commenced detailing enhancements in its indictments. Also, having not followed such a procedure in United States v. Fanfan (and understandably so, pre-Blakely), Judge D. Brock Hornby of the District of Maine concluded in the eventual companion case to Booker that he could not use non-jury findings when imposing the sentence. No. 03-47, 2004 WL 1723114, at *5 (D. Me. June 28, 2004), rev'd 543 U.S. 220 (2005).

82

Moreover, in the wake of Blakely, a number of states have adopted this same procedure or some variant thereof, See Jon Wool, Beyond Blakely: Implications of the Booker Decision for State Sentencing Systems, 17 Fed. Sentencing Rep. 285, 285 (2005), and the Commission itself reported "Blakely-izing" the Guidelines as a possible -- and practiced -- trial court response, U.S. Sentencing Commission, Preliminary Findings: Federal Sentencing Practices Subsequent to the Supreme Court's Decision in Blakely v. Washington, Nov. 2004, at 4, 10, at http://www.ussc.gov/ Blakely/blakelyoutreachpreliminaryfindings.pdf.

Then came Remedial Booker.

## B. The Court's Present Standing Procedure (Revised to Accommodate Remedial Booker)

I well remember the advent of Booker. We were trying a jury case. The law clerks, recognizing my continuing interest in these matters, e-mailed the decision to my courtroom deputy clerk, Elizabeth Smith, in the courtroom. She began printing out the decision. The courtroom printer is notoriously slow. As the first page came out of the printer, she slapped on a "Post-It" note and, grinning, passed it up to me. On the note was a little smiley face and the words "You'll love this!" Page by page, Justice Stevens's majority opinion was passed up to me until it was fully assembled.

The printer kept on humming.

83

Ms. Smith stopped passing the pages in order to scan for herself what turned out to be Remedial Booker. After three or four pages had printed out, she applied another "Post-It" and, crestfallen, passed them up. The second note read, "How can there be two different majority opinions in the same case?"

How indeed?

As described above, even before Blakely, this Court's practices had reflected the preferred remedy of the dissenting Justices in Remedial Booker. See Green, 346 F. Supp. 2d at 359 (D. Mass. 2004). Remedial Booker, however, required this Court to revise its standard procedures for criminal trials and sentencings. I did so at once. The Court's modified practice, while still giving effect to Apprendi, Blakely, and Constitutional Booker, is also faithful to Remedial Booker and to subsequent First Circuit precedent.

### 1. Today's Law

At present, this Court understands the applicable law to be as follows:

- It is unconstitutional for a sentencing court to think itself bound by the Guidelines or for an appellate court categorically to mandate a sentence within the Guidelines range. Booker, 543 U.S. at 233-35, 259.

- A sentencing court must, however, calculate and consider the Guidelines before imposing a sentence on any given defendant. Booker, 543 U.S. at 264.

84

- It is not unconstitutional for a sentencing judge -- rather than a jury -- to find the facts necessary to arrive at the appropriate Guidelines range. Booker, 543 U.S. at 249-58; Antonakopoulos, 399 F.3d at 75; Yeje-Cabrera, 430 F.3d at 23.

- The judge must so find those facts if supported by a preponderance of the evidence. Yeje-Cabrera, 430 F.3d at 23; see infra Parts IV.B.2 & IV.B.3.

- Though a sentencing court must consider all factors listed in Title 18, Section 3553(a) of the U.S. Code, the suggested Guidelines range is to be given "substantial weight". Jiménez-Beltre, 440 F.3d at 517, 518.

- Deviation from the Guidelines range must be for individualized, case-specific reasons -- not in disregard of the policy decisions by Congress or the Commission as expressed in the Guidelines. Pho, 433 F.3d at 62. The court, however, is not prohibited from considering factors specifically prohibited or discouraged by the Guidelines. Smith, 445 F.3d at 5.

- The further a sentence departs from the Guidelines range, the more compelling the findings and explanation by the sentencing court must be. Smith, 445 F.3d at 4.

In light of these controlling decisions, this Court revised its standard procedure in one critical respect: It is presently the responsibility of the judge to find the facts upon which any Guidelines enhancement rests. I do so. All other aspects of the Court's procedure, however, have remained the same. See supra Part IV.A. The jury is now relegated to an advisory capacity. Its presence and involvement, of course, still focuses the evidentiary presentation and secures the fair, impartial, and fresh opinion of twelve ordinary Americans. Its advice is of inestimable -- but presently not controlling -- value. The

Court, though, still wrestles with the appropriate standard of proof; but when Kandirakis came to be sentenced, I concluded that controlling precedent required me to apply a preponderance standard to Guidelines enhancement facts.

Both of these issues require some explanation.

## 2.   Judicial Fact-Finding: The Role of an Advisory Jury

Many courts had anticipated Blakely's application to the Guidelines and began to require jury fact-finding of enhancements.   In the wake of Remedial Booker, however, circuit courts quickly stamped out such movements.  Most, in discussing the post-Booker role of the Guidelines, have ruled implicitly that the pre-Booker, judge-based procedure for finding enhancement facts has not changed.  Some have done so explicitly. See, e.g., United States v. Mares, 402 F.3d 511, 519 (5th Cir. 2005); United States v. Crosby, 397 F.3d 103, 114-15 (2d Cir. 2005).  Even this Court must concede that if Remedial Booker stands for nothing else, it is that judicial fact-finding was of paramount concern (indeed, preoccupation) to that five-Justice majority of the Supreme Court.  See supra Parts II.C & II.D. That majority's remand of Booker's companion case, United States v. Fanfan, in which Judge Hornby refused to base a defendant's sentence on facts not found by a jury, belies any contention that

86

conclusive jury fact-finding is proper in light of Remedial
Booker. See Booker, 543 U.S. at 267-68.

In United States v. Yeje-Cabrera, 430 F.3d 1 (1st Cir.
2005), the First Circuit concluded likewise and reversed this
Court, emphatically declaring business-as-usual with regard to
finding Guidelines enhancements. "The district court was not
'constrained' by the jury's verdict, as it thought it was, to
finding less than 500 grams of cocaine. Instead, it could (and
should) have found [the defendant] responsible for the amount of
cocaine established by a preponderance of the evidence against
him . . . . That alone is reason to vacate the sentence and to
remand."[63] Id. at 23. Calling this Court's decision "simply a

---

[63]The First Circuit deemed this Court's Green opinion
"advisory", even though "styled as a sentencing memorandum".
Yeje-Cabrera, 430 F.3d at 22. Ironically, the First Circuit
continued its discussion of this Court's reasoning for sixteen
more pages after declaring its first reason "enough" for
reversal.

The larger point is this: Federal judges are given lifetime
tenure for a reason. Protected from the hurly-burly of the
political world, we are the only constitutional officers who can
feel safe from reprisal for speaking candidly on an issue.
Though we must usually be diffident in what we do, it would be a
dereliction of duty to fail to defend the truth with what we say.
See Sarah M.R. Cravens, Judges as Trustees: A Duty to Account and
an Opportunity for Virtue, 62 Wash. & Lee L. Rev. 1637, 1649
(2005) ("In the case of judgment orders or memorandum
dispositions (in which no reasoning, but only outcomes, are
provided), the avoidance of any explanation is, in my view, an
outright abdication of the judicial role."). "[A] body of law is
more rational and more civilized when every rule it contains is
referred articulately and definitely to an end which it subserves
and when the grounds for desiring that end are stated . . . in
words." Oliver Wendell Holmes, The Path of the Law, 10 Harv. L.
Rev. 457, 469 (1897). As Cardozo remarked, "I sometimes think
that we worry ourselves overmuch about the enduring consequences

87

wrong guess as to the direction the law would take", <u>id.</u>, the First Circuit ruled that it was "well settled that . . . the remedy was to make the Guidelines non-mandatory", not "require[]
. . . that certain issues . . . be decided by a jury, not a judge", <u>id.</u> at 17.

Given that two members of the slim Remedial <u>Booker</u> majority no longer serve, this Court doubts how "well settled" its remedy is.  Accord <u>Jiménez-Beltre</u>, 440 F.3d at 528 n.11 (Lipez, J., dissenting); <u>see also</u> <u>infra</u> note 68 and accompanying text. Nevertheless, of course, I have and will scrupulously continue to obey the First Circuit's commands in this regard until my "guess" proves to be correct.  In the meantime, conclusive jury fact-finding is not permitted.[64]

_____

of our errors.  They may work a little confusion for a time.  In the end, they will be modified or corrected or their teachings ignored.  The future takes care of such things.  .  .  .  There is no assurance that the rules of the majority will be the expression of perfect reason when embodied in constitution or in statute.  We ought not to expect more of it when embodied in the judgments of the courts.  The tide rises and falls, but the sands of error crumble."  Benjamin N. Cardozo, <u>The Nature of the Judicial Process</u> 177, 179 (1921).

This Court stands by its so-called advisory opinion with the hope that it might have influence in quarters beyond the First Circuit and in eras beyond this one.

[64]To say, however, that Remedial <u>Booker</u> "alleviate[d] some of the concerns which motivate the district court", <u>Yeje-Cabrera</u>, 430 F.3d at 23, completely misapprehends the nature of the Court's concerns.  Whatever this Court's view of the length of criminal sentences, it has no quarrel with its limited institutional role in carrying out the policy decisions of the Congress in this regard.  The Court neither applauds nor laments its newfound discretion in sentencing.  I, unlike many commentators, have never advocated for increased judicial

Nothing in Remedial <u>Booker</u> or subsequent First Circuit precedent, though, prevents this Court from seeking the advice of an advisory jury on these most crucial matters. Thus, the Court -- similar to its practice immediately following <u>Blakely</u> -- has the government prove to the jury each Guidelines enhancement the government will seek to apply in calculating the Guidelines range if the defendant is convicted. At the trial or sentencing hearing, such proof still must consist of testimony and items placed in evidence pursuant to the Federal Rules of Evidence. Since Remedial <u>Booker</u>, however, when finding facts relevant to Guidelines enhancements, the Court (as before <u>Blakely</u>) considers the pre-sentence report filed by the Probation Office, as well as any other data placed before it by the government or the defendant. Based on all of this information, including the results of the jury's deliberation, the Court makes its own, <u>independent</u> finding on the presence or absence of such enhancements. The Court then imposes an appropriate sentence, giving substantial (but not controlling) weight to the advisory Guidelines range.

This procedure gives as much respect to the timeless principles articulated in <u>Apprendi</u>, <u>Blakely</u>, and Constitutional

---

discretion in sentencing. Rather, my primary concern always has been with the <u>process</u> by which the congressional policy is implemented and the fundamental necessity of the jury's involvement therein. Remedial <u>Booker</u> and the First Circuit's subsequent decisions do little to alleviate this concern.

Booker as is currently allowed by Remedial Booker and First

Circuit precedent. As required by Yeje-Cabrera, the Court makes

its own, independent finding[65] regarding the necessary

enhancements.[66]  Further, as required by Remedial Booker and

___

[65]The government has not yet grasped this fundamental aspect of the Court's procedure, as it repeatedly proselytizes this Court on the necessity for the Court to make its own factual determinations.  See United States v. Mittel-Carey, No. 05-10335 (D. Mass. filed Dec. 7, 2005), Gov't's Notice [Doc. No. 30] at 5-12; United States v. Ruiz-Morales, No. 05-10109 (D. Mass. filed Apr. 20, 2005), Gov't's Mot. to Recons. [Doc. No. 11] at 4-8.  To state it again: Pursuant to First Circuit law, the Court makes its own, independent finding on the relevant Guidelines enhancement facts; the Court does not adopt the jury's findings wholesale.  This very case provides an excellent example of the Court's procedure in this regard.  See infra Parts V & VI.

[66]Counsel for Kandirakis argued that United States v. Spock, 416 F.2d 165 (1st Cir. 1969), instructs that there can be no such "advisory" use of a jury verdict in a criminal case.  See Sentencing Hr'g, Feb. 24, 2006 [Doc. No. 69], Tr. at 25-27. Spock, however, is inapposite.  The judge in that case, in addition to the general question of guilt, asked the jury to find each element of the crime.  Spock, 416 F.2d at 180.  The Spock Court held this practice to be tantamount to "judicial pressure" to return a guilty verdict.  Id. at 181.  "There is no easier way to reach, and perhaps force, a verdict of guilty than to approach it step by step."  Id. at 182.  The general verdict, therefore, is constitutionally protected.

In this case, however -- as in all cases in which the Court employs these procedures -- the special findings put to the jury are not the essential elements of the crime charged, but are simply the facts undergirding an enhancement.  The Spock Court specifically recognized this exception to the normal rule prohibiting special verdicts.  Id. at 183 n.41.  There is no reason to believe that juries are improperly led to a guilty verdict merely by the presence of issues to be resolved only upon such a finding.  This Court instructs juries that they are to resolve questions about enhancement facts only if they first find guilt beyond a reasonable doubt.  See Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985) ("The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow

Jiménez-Beltre, the Court calculates and considers the Guidelines

to the mandated degree, deviating only for case-specific reasons

as required by Pho. It is true, as the government has argued

elsewhere, see United States v. Ruiz-Morales, No. 05-CR-10109 (D.

Mass. filed Apr. 20, 2005), Gov't's Mot. to Recons. [Doc. No.

11], that Justice Breyer's opinion in Remedial Booker interpreted

"court" in the Sentencing Reform Act to require "the judge

without the jury" to find the facts necessary to an enhancement,

rather than "the judge working together with the jury". 543 U.S.

at 249.[67] This Court is not "working together with the jury" in

_____

the instructions given them.").

The closest common analogy is the jurisprudence of lesser
included offenses in the Commonwealth of Massachusetts. There,
for example, the jury must first determine whether the defendant
has committed criminal homicide and then, with the addition of
other elements proved beyond a reasonable doubt, determine
whether the crime is voluntary manslaughter or murder in the
first or second degree.

[67]As Justice Stevens pointed out, this interpretation of
"court" was hardly necessary. Booker, 543 U.S. at 286-87
(Stevens, J., dissenting in part). A similar debate occurred in
1788 during the debate on ratification of the Constitution.
Responding to criticism by some that "Court" as used therein
effectively abolished juries, John Marshall retorted,
    Does the word Court only mean the Judges? Does not the
    determination of a jury, necessarily lead to the
    judgment of the Court? Is there any thing here which
    gives the Judges exclusive jurisdiction of matters of
    fact? What is the object of a jury trial? To inform
    the Court of the facts. When a Court has cognizance of
    facts, does it not follow, that they can make enquiry
    by a jury? It is impossible to be otherwise. I hope
    that in this country, where impartiality is so much
    admired, the laws will direct facts to be ascertained
    by a jury.
John Marshall on the Fairness and Jurisdiction of the Federal
Courts (June 20, 1788), in 2 Debate on the Constitution, supra,

91

the sense Justice Breyer condemned, however.  Justice Breyer was

rejecting the solution proposed by the Remedial Booker dissenters

(i.e., conclusive jury fact-finding).  As discussed above and

demonstrated by this case, see infra Parts V & VI, the jury

determination is merely advisory on the enhancement issue; the

Court -- as is presently required -- makes its own, independent

findings on relevant enhancement facts.

The government apparently can perceive no benefit from

having a jury finding on an issue which the Court is "obligated

not to be bound by".  United States v. Ruiz-Morales, No. 05-

10109, Hr'g on Mot. to Recons., Mar. 31, 2006 [Doc. No. 16], Tr.

at 15.  The government is "unclear as to how the presence of a

jury and the jury's rendering a verdict which [the Court] must

not be bound by helps [the Court] with [its] fact finding".  Id.

at 16.  Let me again explain:

> The American jury "is the purest example of
> democracy in action that I have ever experienced."
>     The American jury must rank as a daring effort in
> human arrangement to work out a solution to the
> tensions between law and equity and anarchy.
>     No other legal institution sheds greater insight
> into the character of American justice.  Indeed, as an
> instrument of justice, the . . . jury is, quite simply,
> the best we have.  "[T]he greatest value of the jury is
> its ability to decide cases correctly."  We place upon
> juries no less a task than discovering and declaring

at 730, 736.  Though Remedial Booker was interpreting the
Sentencing Reform Act of 1984, the similarity between the
language of that Act and the Constitution in this respect -- as
well as the debate surrounding the meanings of the word "court"
-- is patent.  How far we have strayed in the intervening 218
years.

the truth in each case.  In virtually every instance,
these twelve men and women, good and true, rise to the
task, finding the facts and applying the law as they,
in their collective vision, see fit.  In a very real
sense, therefore, a jury verdict actually embodies our
concept of "justice."  Jurors bring their good sense
and practical knowledge into our courts.  Reciprocally,
judicial standards and a respect for justice flow out
to the community.  The acceptability and moral
authority of the justice provided in our courts rests
in large part on the presence of the jury.  It is
through this process, where rules formulated in light
of common experience are applied by the jury itself to
the facts of each case, that we deliver the very best
justice we, as a society, know how to provide.

. . . .

Only because juries may decide most cases is it
tolerable that judges decide some.  However highly we
view the integrity and quality of our judges, it is the
judges' colleague in the administration of justice --
the jury -- that is the true source of the courts'
glory and influence.  The involvement of ordinary
citizens in a majority of the court's tasks provides
legitimacy to all that is decreed.  When judges decide
cases alone, they are still surrounded by the
recollection of the jury.  Judicial voices, although
not directly those of the community itself, echo the
values and judgments learned from observing juries at
work.

William G. Young, An Open Letter to U.S. District Judges, Fed.

Law., July 2003, at 30 (footnotes omitted).  Put another way, in

addition to all the structural constitutional reasons detailed

earlier, see supra Part III.B., the conclusions of twelve lay

people who have examined the evidence and deliberated thereon are

more likely to be correct (and accepted) than the pronouncement

of a single, jaded and calloused employee of the state.

Moreover, unlike the Court, which must consider extra-evidence

data such as the pre-sentence report, if the only data relied

upon by the jury are those that pass muster under the Federal

93

Rules of Evidence (which themselves exist to serve truth-seeking, see Fed. R. Evid. 102), the result reached is likewise more likely to be accurate. As was recognized long ago, jury fact-finding is "the best criterion[] for investigating the truth of facts[] that was ever established in any country." 3 Blackstone, supra, at 385.

Judge Joseph R. Goodwin has explained how this principle relates to his role in sentencing under the "advisory" Guidelines:

> One of the fundamental problems with advice is determining how much confidence to place in it. The reliability of the advice helps inform that determination, and reliability is best quantified through an appropriate standard of proof. Specifically, the reasonable-doubt standard offers a useful method for measuring the degree of certainty that I have in the factual determinations underpinning the advisory Guideline range.
>
> . . . .
> . . . . While this additional consideration is no more binding on my determination than the advisory Guidelines themselves, it will help me to weigh the reliability of the advice provided by the Guidelines, and will inform the exercise of my discretion as I determine an appropriate sentence in light of the advisory Guideline range and the 3553(a) factors.

United States v. Gray, 362 F. Supp. 2d 714, 720, 723 (S.D. W. Va. 2005). Though Judge Goodwin applies the reasonable doubt standard himself, the results of an analysis performed by a jury under the same standard inform this Court in the same manner he details. By employing this procedure, the Court simply seeks to enhance the precision of the fact-finding process. Surely no reasonable person would argue that this Court is not permitted to

consider the strength of the evidence against the defendant in the exercise of its sentencing discretion. See United States v. Dazey, 403 F.3d 1147, 1177 (10th Cir. 2005) ("District Courts might reasonably take into consideration the strength of the evidence in support of sentencing enhancements, rather than (as in the pre-Booker world) looking solely to whether there was a preponderance of the evidence, and applying Guidelines-specified enhancements accordingly."); see also Fed. R. Crim. P. 57(b) ("A judge may regulate practice in any manner consistent with federal law, these rules, and the local rules of the district.").

Finally, given Remedial Booker's slim majority and the new composition of the Supreme Court, the state of the law in this area is uncertain and in flux.[68]  As a matter of prudence, it serves the interests of judicial economy to try criminal cases in this manner. Kelley, 355 F. Supp. 2d at 1038 ("In view of the uncertainty surrounding this issue, the court will err on the side of caution in protecting a criminal defendant's constitutional rights. Just as a court should construe a statute

_____

[68]Indeed, Justice Ginsburg, who provided the crucial fifth vote for Remedial Booker, recently penned a dissent in Washington v. Recuenco, 126 S. Ct. 2546, 2554-57 (2006), arguing that it was structural error (not harmless error) for the jury not to decide sentencing factors -- the very remedy Remedial Booker precluded.
    Moreover, Chief Justice Roberts and Justice Alito did not sign a concurring opinion by Justice Kennedy which expressed thinly veiled disapproval of Apprendi and Blakely, though following it as Supreme Court precedent. See id. at 2553 (noting curtly that those cases "and their progeny were accompanied by dissents").

to avoid a constitutional infirmity if possible, prudence dictates that the court should adopt sentencing procedures that lessen the potential that a sentence will later be found unconstitutional." (citation omitted)). Should the Supreme Court eventually adopt the view of the Remedial Booker dissenters -- as this Court understands the Constitution to require -- cases tried in this Court by these procedures will not have to be retried, as the jury already will have issued a verdict on the enhancement facts. For this, the government some day will be grateful.

The government's objections to this Court's procedures, then, must come down to a calculated determination to marginalize the American jury and thereby enhance executive power at the expense of the Congress and the judiciary. This Court's procedure instead minimizes the drain on the moral authority of the judiciary, preserving at least a modicum of involvement by its democratic branch and maximizing the voice of the people -- to the extent higher courts presently will entertain it.

### 3.    The Proper Standard of Proof Concerning Enhancement Facts

Nothing in Remedial Booker precludes judges from utilizing a reasonable doubt standard in the determination of enhancement facts. In Apprendi the Supreme Court held that, in addition to having a jury find every fact, "[e]qually well founded is the companion right to have the jury verdict based on proof beyond a

96

reasonable doubt." Apprendi, 530 U.S. at 478 (emphasis added). The decision in Apprendi rested on both the Sixth Amendment and the Fourteenth. See id. at 476-77. To which right, then, is the reasonable doubt standard a "companion" -- the Sixth Amendment right to a jury or the right to Due Process? Because Booker dealt only with the Sixth Amendment, if the requisite standard of proof is a companion to Due Process, applying a reasonable doubt standard when finding enhancement facts seems compelled under applicable Supreme Court precedent, despite Remedial Booker.

The answer is made somewhat more obscure because, in most of the Supreme Court's key rulings on this issue, the government party has been a state, not the federal government. See Blakely v. Washington, 542 U.S. 296 (2004); Apprendi v. New Jersey, 530 U.S. 466 (2000); McMillan v. Pennsylvania, 477 U.S. 79 (1986); Patterson v. New York, 432 U.S. 197 (1977); Mullaney v. Wilbur, 421 U.S. 684 (1975) (Maine); In re Winship, 397 U.S. 358 (1970) (New York). In order to apply Sixth Amendment strictures to states, of course, the Fourteenth Amendment's Due Process Clause must be used. Any mention of Due Process in these cases, therefore, is inherently ambiguous regarding the independent necessity of the Due Process Clause to the holding.

Apprendi offers help here. It stated, "At stake in this case are constitutional protections of surpassing importance: the proscription of any deprivation of liberty without 'due process of law,' Amdt. 14, and the guarantee that 'in all criminal

97

prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury,' Amdt 6." Apprendi, 530 U.S. at 476-77.  The separate reference to Due Process is noteworthy. Further, Apprendi unequivocally reaffirmed the Supreme Court's decision in Winship, see Apprendi, 530 U.S. at 484, 490, which had ruled that the requisite standard of proof was mandated by Due Process, Winship, 397 U.S. at 364.  Moreover, Apprendi "confirm[ed] the opinion that [the Court] expressed in Jones", Apprendi, 530 U.S. at 490, which had itself expressed Due Process concerns with the standard of proof, see Jones, 526 U.S. at 242-43.  Because the United States was the government party in Jones, in order to mention Due Process, the Fifth Amendment must have been at play.  See id. at 243 n.6 (citing the Fifth Amendment). Due Process need not have been mentioned in Jones (nor confirmed in Apprendi) if all aspects of these cases could have been disposed of solely on the basis of the Sixth Amendment.

Pre-Apprendi cases tend to confirm this conclusion as well. Mullaney held that states could not reallocate the burden of proof such that it negates the presumption of innocence; to do so was contrary to Due Process.  421 U.S. at 703-04. As explained earlier, the reasonable doubt standard is intimately related to this presumption of innocence.  See supra Part III.C.  Likewise, even if some aspects of its holding were subsequently questioned, McMillan rested its approval of the preponderance standard for "sentencing factors" on its interpretation of Due Process.  See

477 U.S. at 91-93.  Indeed, the Sixth Amendment argument of the petitioners in that case "merit[ed] little discussion" in light of the Supreme Court's Due Process holding.  Id. at 93.

What becomes clear from these cases is that the standard of proof is not bound up with the identity of the decisionmaker, but rather the nature of the matter to be proved.  Pre-Apprendi cases adhered to an "element"/"sentencing factor" dichotomy and used that framework to decide when the protections of the Sixth Amendment and Due Process were triggered.  Cases since Apprendi, however, have adopted a more functional approach to this dichotomy.  See supra Part III.A.  This is the primary teaching of Apprendi.  See 530 U.S. at 487 n.13 (limiting the holding of McMillan).

The absence of pure Due Process discussions in post-Apprendi cases indicates that no alteration of the standard of proof set forth in Apprendi was intended in those cases.  The Supreme Court's decisions in Blakely and Booker expounded various aspects of the Apprendi rule, but not its stated standard of proof.  No majority opinion in either Blakely or Booker mentions the Fifth Amendment or Due Process; both are pure Sixth Amendment cases.  The debate in Booker, in particular, addressed the identity of the fact-finder, judge or jury, not the standard of proof to be applied.  Repeated analyses by various majorities of the Supreme Court, therefore, show that no case subsequent to Apprendi -- not even Remedial Booker -- altered the law regarding the Due Process

99

necessity of applying the reasonable doubt standard to enhancement facts.

It may be that Remedial Booker contemplated continued (albeit advisory) application of the Guidelines, which theretofore had relied on the preponderance standard for finding the relevant facts. That opinion, however, rested its argument on an interpretation of the Sentencing Reform Act. And unlike judicial fact-finding, which purportedly was mandated by that Act, the preponderance standard emanates from the Guidelines themselves: "The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case." USSG § 6A1.3, comment (emphasis added); see United States v. Watts, 519 U.S. 148, 156 (1997) ("The Guidelines state that it is 'appropriate' that facts relevant to sentencing be proved by a preponderance of the evidence, and we have held that application of the preponderance standard at sentencing generally satisfies due process." (citations omitted)); see also Stinson v. United States, 508 U.S. 36, 38 (1993) ("[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline.").

In eventual practice, the permissive use of the preponderance standard, as provided by the Guidelines commentary and pre-Apprendi Supreme Court rulings, was turned by circuit court precedent into a mandatory use. See, e.g., United States v. Santos Batista, 239 F.3d 16, 21 (1st Cir. 2001). Because these rulings are predicated on the "authoritative" nature of the Guidelines, however, see Stinson, 508 U.S. at 38, Constitutional Booker casts significant constitutional doubt on such blind adherence. See Booker 543 U.S. at 306 n.4 (Scalia, J., dissenting in part) ("[T]he Commission's view of what is 'better' is no longer authoritative, and district judges are free to disagree -- as are appellate judges."). Justice Thomas states the point most directly:

> The commentary to § 6A1.3 states that the Commission believes that use of a preponderance of the evidence standard [satisfies Due Process]. The Court's holding today [in Constitutional Booker] corrects this mistaken belief. The Fifth Amendment requires proof beyond a reasonable doubt, not by a preponderance of the evidence, of any fact that increases the sentence beyond what could have been lawfully imposed on the basis of facts found by the jury or admitted by the defendant.

Id. at 319 n.6 (Thomas, J., dissenting in part) (internal quotation marks omitted). This, in conjunction with the renewed emphasis on the constitutionality of the reasonable doubt standard since Apprendi, suggests that a heightened burden of proof, if not explicitly required by Due Process, is at least permitted.

Several courts since Booker have issued decisions in this vein. Judge Gertner, of this District, has been a leading contributor to post-Booker judicial scholarship. She writes, "We cannot have it both ways: We cannot say that facts found by the judge are only advisory, that as a result, few procedural protections are necessary[,] and also say that the Guidelines are critically important. If the Guidelines continue to be important, if facts the Guidelines make significant continue to be extremely relevant, then Due Process requires procedural safeguards and a heightened standard of proof, namely proof beyond a reasonable doubt." United States v. Pimental, 367 F. Supp. 2d 143, 154 (D. Mass. 2005).[69]   "[E]ven if the Sixth

---

[69]Judge Gertner has also written on the dubious vitality of United States v. Watts, 519 U.S. 148 (1997), which upheld the use of acquitted conduct in calculating Guidelines ranges if later found by a preponderance of the evidence.  Pimental, 367 F. Supp. 2d at 149-53; see also United States v. Coleman, 370 F. Supp. 2d 661, 668-73 (S.D. Ohio 2005) (refusing to consider acquitted conduct); United States v. Gray, 362 F. Supp. 2d 714, 721-22 (S.D. W. Va. 2005) (noting that Constitutional Booker called the holding of Watts into significant question); United States v. Carvajal, No. 04 CR 222AKH, 2005 WL 476125, at *5 (S.D.N.Y. Feb. 22, 2005) (sentencing convicted defendant to term less than Guidelines range in order to "accord the jury's [not guilty] findings proper respect"); Letter from Jon M. Sands, supra note 4, Memorandum at 23-24.  But see United States v. Dorcely, No. 05-3130, -- F.3d --, 2006 WL 2034245, at *3-4 (D.C. Cir. July 21, 2006) (ruling that a court may use acquitted conduct in calculating the recommended Guidelines range); United States v. Faust, No. 05-11329, -- F.3d --, 2006 WL 2035467, at *4-5 (11th Cir. July 21, 2006) (same); United States v. High Elk, 442 F.3d 622, 626 (8th Cir. 2006) (same); United States v. Vaughn, 430 F.3d 518, 526-27 (2d Cir. 2005) (same); United States v. Price, 418 F.3d 771, 787-88 (7th Cir. 2005) (same); United States v. Magallanez, 408 F.3d 672, 684-85 (10th Cir. 2005) (same); United States v. Duncan, 400 F.3d 1297, 1304-05 (11th Cir. 2005) (same).

Amendment's jury trial guarantee is not directly implicated because the regime is no longer a mandatory one, the Fifth Amendment's Due Process Clause requirement is." Id. at 153.

Judge Joseph F. Bataillon of the District of Nebraska has likewise issued several decisions addressing the Due Process implications of finding enhancement facts by a preponderance of the evidence. See, e.g., United States v. Okai, No. 4:05CR19, 2005 WL 2042301 (D. Neb. Aug. 22, 2005), rev'd No. 05-3560, -- F.3d --, 2006 WL 2011338 (8th Cir. July 20, 2006); United States v. Kelley, 355 F. Supp. 2d 1031 (D. Neb. 2005); United States v. Huerta-Rodriquez, 355 F. Supp. 2d 1019 (D. Neb. 2005). In Huerta-Rodriquez, Judge Bataillon wrote that "[a]lthough the advisory Guidelines system does not arouse Sixth Amendment concerns to the extent that a mandatory Guidelines system does, this is not to say that there are no longer any constitutional constraints on sentencing under Booker". 355 F. Supp. 2d at 1024 (citation omitted); see also Okai, 2005 WL 2042301, at *6 n.4. Judge Bataillon then ruled that even though the defendant had pleaded guilty and waived his right to a jury, the government still would be required to prove enhancement facts to him beyond a reasonable doubt. Huerta-Rodriquez, 355 F. Supp. 2d at 1027-

See also United States v. Malouf, 377 F. Supp. 2d 315, 320-27 (D. Mass. 2005) (Gertner, J.) (holding that subsequent Supreme Court precedent has effectively overruled Harris v. United States, 536 U.S. 545 (2002), which exempted facts establishing mandatory minima from the rule of Apprendi).

28. "Whatever the constitutional limitations on the advisory sentencing scheme, the court finds that it can never be 'reasonable' to base any significant increase in a defendant's sentence on facts that have not been proved beyond a reasonable doubt." Id. at 1028. Therefore, "the court will not rely on facts proved to a mere preponderance of evidence in order to increase a defendant's sentence to any significant degree." Id. at 1029; see also United States v. Harper, 360 F. Supp. 2d 833, 836 (E.D. Tex. 2005) (Clark, J.) ("[S]entence enhancements under the guidelines require more than inferences drawn from a preponderance of the evidence."). Judges Gertner and Bataillon are, of course, correct. The Fifth Amendment and its current Supreme Court interpretation require proof beyond a reasonable doubt of enhancement facts.

Like me, those two judges are district judges. The First Circuit in Yeje-Cabrera, however, interpreted Remedial Booker to mandate the use of a preponderance standard in finding Guidelines enhancement facts: "The district court was not 'constrained' by the jury's verdict, as it thought it was, to finding less than 500 grams of cocaine. Instead, it could (and should) have found [the defendant] responsible for the amount of cocaine established by a preponderance of the evidence against him . . . . That alone is reason to vacate the sentence and to remand." 430 F.3d

104

at 23 (emphasis added).[70]  Even though the preponderance standard

originated in the Guidelines themselves[71] -- and this Court is

supposedly "free to disagree" -- such a categorical rejection of

Guidelines "policy" would run counter to Pho.  The

straightforward language of these decisions admits of no

equivocation.  I hear and I obey.  Thus, in the face of Yeje-

Cabrera and Pho, this Court is bound to apply a preponderance

standard to enhancement facts, at least until it is persuaded

that "the law" on this issue has changed.

---

[70]The Third Circuit also recently held that Guidelines
enhancement facts should be found by a preponderance of the
evidence.  United States v. Grier, 449 F.3d 558, 563 (3d Cir.
2006).  That opinion tied the standard of proof to the Sixth
Amendment jury right: "That a defendant does not enjoy the right
to a jury trial under Booker ineluctably means that he or she
does not enjoy the right to proof beyond a reasonable doubt."
Id. at 564.  Citing Apprendi, Blakely, and Booker, the court
(strangely) used the formalistic, pre-Apprendi "element"-
"sentencing factor" dichotomy to rule that "[i]t is to these
facts [elements], and to these facts alone, that the rights to a
jury trial and proof beyond a reasonable doubt attach."  Id. at
565.  The Third Circuit, on July 19, 2006, vacated the panel
decision in Grier and will be rehearing the case en banc.  See
United States v. Grier, No. 05-1698, -- F.3d --, 2006 WL 2006256
(3d Cir. July 19, 2006).
     Likewise, the Eighth Circuit recently reversed a sentence
imposed by Judge Bataillon because he did not apply the
preponderance standard to Guidelines enhancement facts.  United
States v. Okai, No. 05-3560, -- F.3d --, 2006 WL 2011338, at *2-3
(8th Cir. July 20, 2006).

[71]The Federal Public Defenders, in addition to arguing that
the preponderance standard is unconstitutional, have proposed
that the Sentencing Commission change the Guidelines' policy
statement on this issue in the interest of procedural fairness
and accuracy.  See Letter from Jon M. Sands, supra note 4,
Memorandum at 1-4.

## V.  Kandirakis's Trial

Kandirakis's trial commenced on September 12, 2005.  The government had no evidence of undercover buys from Kandirakis, but it did have hard evidence in the form of taped telephone conversations in which he was heard to offer OxyContin for purchase.  These telephone conversations painted Kandirakis as a willing conspirator in an OxyContin conspiracy -- though, a rather pathetic wannabe OxyContin retailer who was trying to achieve greater market share at Arco's expense.  This created a bit of a problem for the government, as Arco was supposedly a co-conspirator with Kandirakis.  The government sought to stitch Siciliano, Arco, and Kandirakis together with the testimony of Jonah Adelman ("Adelman").

As is frequently the case in federal criminal prosecutions, Adelman was himself a pled-out drug offender trying to earn a lighter sentence by making other cases for the government.  While he duly performed here, testifying both as to the conspiracy itself and the quantity of OxyContin in play, Adelman was extensively and sagaciously cross-examined and his credibility severely shaken -- especially as to Kandirakis, who was the least involved.  Nevertheless, when the government rested, the Court found by a fair preponderance of the evidence, pursuant to United States v. Petrozziello, 548 F.2d 20 (1977), that Kandirakis was, in fact, a member of the alleged OxyContin conspiracy and that

106

the hearsay statements provisionally admitted under Federal Rule of Evidence 801(d)(2)(E) were all properly admitted.

On the sixth day of trial, the Court properly charged the jury and expressly asked them -- if they found Kandirakis guilty -- to find the amount of drugs properly attributable to him:

> Now, if the government proves [an OxyContin conspiracy], you may find Mr. Kandirakis guilty [on] Question 1. If there exists a reasonable doubt as to [a conspiracy,] you must find him not guilty. Then you stop, you return a verdict.
> Now, Question 2. Again, you only get to Question 2, don't even think about Question 2 until unanimously you have agreed that Mr. Kandirakis is guilty of conspiracy to distribute [OxyContin] pills. . . . .
> If you think he's guilty, and that's how you're going to check Question 1, then I need to know how much. . . . .
> . . . .
> Now, if you can tell me beyond a reasonable doubt a specific number of pills, write that in there. You all have to agree. It has to be unanimous. But if you can't tell me a specific number of pills, but any of these categories that I've listed below is a category that the government has proved beyond a reasonable doubt, check that category. The law in effect makes it easy. They don't have to prove a specific number of pills. They can prove the category. Only make one check. Check that you agree.
> . . . .
> . . . . If you cannot agree, you nevertheless, even if it's a guilty verdict on Question 1, that's an appropriate verdict to return, just leave that blank, and just leave the amounts blank unless you can unanimously agree as I have charged you.

United States v. Kandirakis, No. 04-10372 (D. Mass. filed Dec. 15, 2004), Jury Charge [Doc. No. 61], Tr. at 18-19, 20, 23. Neither party objected to these aspects of the charge.

That same day, the jury found Kandirakis guilty of the charged OxyContin conspiracy but, not surprisingly in view of

Adelman's deficiencies, was not persuaded beyond a reasonable doubt that any particular amount or range of amounts of OxyContin pills were properly attributable to Kandirakis. A copy of the verdict slip is attached as Appendix A.

It is important to note how simple and natural is the flow of the trial under these procedures. Because drug quantity is truly relevant conduct, it is an obviously persuasive aspect of the government's case. Since Spring of 2004 when the Court began following these procedures (or revisions thereof), there have been in this session at least eight jury trials of ten defendants in which Guidelines enhancement questions have been put to the jury, involving not only questions of drug quantity, see United States v. Kandirakis, No. 04-10372 (D. Mass. filed Dec. 15, 2004), Jury Verdict [Doc. No. 38] (USSG § 2D1.1(c)); United States v. Hernandez, No. 04-10319 (D. Mass. filed July 14, 2004), Jury Verdict [Doc. No. 87] (same); United States v. Martin, No. 04-10200 (D. Mass filed July 14, 2004), Jury Verdict [Doc. No. 37] (same); United States v. Figueroa, No. 04-10098 (D. Mass. filed Apr. 2, 2004), Jury Verdict [Doc. No. 112] (same); United States v. Lino, No. 03-10377 (D. Mass. filed Dec. 11, 2003), Jury Verdict [Doc. No. 39] (same); United States v. Teague, No. 03-10362 (D. Mass. filed Dec. 3, 2003), Jury Verdict [Doc. No. 173] (same); United States v. Baez, No. 03-10201 (D. Mass. filed June 11, 2003), Jury Verdict [Doc. No. 51] (same), but also questions of the amount of tax loss from false returns and whether the

108

evasion employed sophisticated means, see United States v. Griffin, No. 05-10175 (D. Mass. filed July 13, 2005), Jury Verdict [Doc. No. 124] (USSG §§ 2T4.1, 2T1.1(b)(2)), and whether the defendant was an organizer, manager, or supervisor of criminal activity, see Hernandez, No. 04-10319, Jury Verdict (USSG § 3B1.1); Teague, No. 03-10362, Jury Verdict (same).[72] As any trial judge will confirm, an American jury can skillfully and impartially handle all these matters with discernment and dispatch. While one can conceive of issues surrounding enhancements, such as commission of the charged crime while on probation or supervised release from another crime, which would be improper to fold into the government's case-in-chief, such matters can be easily handled by a bifurcated proceeding, see U.S. Sentencing Commission, Preliminary Findings, supra, at 4, 10. At trial, the procedures are fair[73], simple, and understandable. In short, wholly apart from constitutional considerations, these procedures work -- and work well.

_____

[72]The verdict slips cited in this paragraph, except Kandirakis's, are included as Appendix B.

[73]Despite government protestations that these procedures are an "unfair obligation", United States v. Duverge, No. 05-10265 (filed Sept. 29, 2005), Mot. to Recons. Re: Proof of Enhancements [Doc. No. 37] at 6, fully nine out of a possible ten defendants have been found guilty in trials under these procedures. Though too small of a sample size to draw any meaningful conclusions, this 90% conviction rate in jury trials is not inconsistent with the national average of 84% from 1989-2002. See Andrew D. Leipold, Why Are Federal Judges So Acquittal Prone?, 83 Wash. U. L.Q. 151, 152 (2005).

109

With utmost respect, therefore, it is the duty of this trial
judge to point out that Justice Breyer and those who agree with
him are simply wrong to assume that the American jury cannot
handle these issues. See Booker, 543 U.S. at 254-55 (Breyer, J.,
for the Court) (wondering how juries could ever handle the
complexities of the Guidelines); Apprendi, 530 U.S. 556-57
(Breyer, J., dissenting).⁷⁴  Also misplaced is the concern that
such a system "put[s] [defendants] in the untenable position of
contesting material aggravating facts in the guilt phases of
their trials".  Blakely, 542 U.S. at 334-35 (Breyer, J.,
dissenting); Apprendi, 530 U.S. at 557-58 (Breyer, J.,
dissenting).  Defendants can and do waive their right to jury
fact-finding when potentially prejudicial evidence would be
presented to the jury to prove a Guidelines enhancement.  See,
e.g., Mittel-Carey, No. 05-10335 (waiving right to jury trial on
the number of photographs in defendant's possession that portray
child pornography and whether certain of them are sadistic or
masochistic).  Indeed, many waive it regardless.  See, e.g.,
Ruiz-Morales, No. 05-10109, Letter from Defendant to Judge Young
of Apr. 24, 2006 [Doc. No. 17] at 1.  In addition, these

---

⁷⁴Justice Breyer's brilliant work, Active Liberty:
Interpreting Our Democratic Constitution (2005), proceeds from
the proposition that "the Constitution [is] centrally focused
upon active liberty, upon the right of individuals to participate
in democratic self government".  Id. at 21.  A district judge
might wonder wistfully why Justice Breyer does not recognize the
role of direct democracy within the judicial branch itself.

procedures do not extend the time of trial to any meaningful
degree because the government (almost always) wants to place all
truly relevant conduct before the jury anyway. Regardless, total
judicial economy is improved, as any truly contested enhancement
fact nevertheless would have to be put to an often-redundant
evidentiary hearing.[75]  Finally, over two years of experience in
this session indicates that these procedures do not appear to
have any effect on the rate defendants plead guilty (always a
matter of super-sensitivity to the government).  In short, juries
can and should perform Guidelines enhancement fact-finding, as a
matter both of practice and of constitutional procedure.

_____

[75]These observations are consistent with historical
evaluations of the efficiency of trial by jury.  In the debate
over ratification of the Constitution, James Wilson, speaking of
the advantages of trial by jury remarked, "[A]nd moreover, it is
a cheap and expeditious manner of distributing justice."  1
Debate on the Constitution, supra, at 855.  Blackstone wrote
similarly: "[T]rial by jury . . . is also as expeditious and
cheap as it is convenient, equitable, and certain; for a
commission out of chancery, or the civil law courts, for
examining witnesses in one cause will frequently last as long,
and of course be full as expensive, as the trial of a hundred
issues at nisi prius: and yet the fact cannot be determined by
such commissioners at all; no, not till the depositions are
published and read at the hearing of the cause in court."  3
Blackstone, supra, at 378-79.

   Blackstone, of course, makes an excellent comparison: If not
juries to try cases, then it must be judges.  See Jennifer K.
Robbennolt, Evaluating Juries by Comparison to Judges: Jury
Decisionmaking a Benchmark for Judging, 32 Fla. St. U. L. Rev.
469, 470 (2005).  English experience with the efficiency of such
a system is the stuff of parody.  See Charles Dickens, Bleak
House 16-18 (Penguin ed. 1996) (describing the fictional -- and
interminably complex -- case of "Jarndyce and Jarndyce" in the
Court of Chancery).

## VI. Kandirakis's Sentencing

On February 24, 2006, Kandirakis came before the Court to be sentenced. Having fully tried the issue of drug quantity to the jury, this Court naturally had before it a fully nuanced trial record, replete with a skillful and thorough evidentiary presentation by the government and an equally skillful and discerning cross-examination that eroded credibility and exposed weak points in the government's presentation.

The Court also had before it this District's typically extensive pre-sentence report, as well as statistical data concerning the average sentence imposed for this crime nationwide, in the First Circuit, and in this District. The Court also consulted a sentencing database which sets out and explains every criminal sentence imposed in this session during the past 21 years.[76]

---

[76]In the wake of Remedial Booker, the judiciary has been strangely conflicted about its central role in fashioning individually fair and just sentences. After all, the central premise of Remedial Booker -- contrary to the legislative history of the Sentencing Reform Act of 1984 and all available evidence -- is that, when Congress learned it could not constitutionally have mandatory guidelines, it would have said, "Trust the judges with advisory guidelines, they know what they're doing."

It appears the inferior judiciary itself has substantial misgivings about the validity of this premise. How else to explain the pall of secrecy that has fallen over federal sentencing? Today, the Judgment and Commitment Order -- the central document that explains in standardized terms the precise reasons for the sentence, and its relationship to the Sentencing Guidelines, see supra note 37 -- is denominated by the Judicial Conference "Not for Publication".

[T]he [Sentencing Reform Act] -- in a section entitled "Statement of reasons for imposing a sentence" --

112

requires sentencing judges who choose to vary from the
now-advisory Guideline range to describe why in open
court and commit those reasons to paper "with
specificity in the written order of judgment and
commitment." One might think that this provision would
result in a veritable flood of well-reasoned sentencing
opinions. But one would be wrong.
        The Administrative Office of the U.S. Courts
("AO") has created an anemic form ostensibly in an
effort to comply with this requirement in the wake of
<u>Booker</u>. Ironically described as a "Statement of
Reasons," this document contains a parade of nearly
meaningless check boxes that mirror the broad § 3553(a)
factors. While it does provide space for a factual
justification, the form almost seems designed to
encourage the kind of mechanical -- and arguably
unreasoned -- approach to sentencing <u>Booker</u> tried to
extinguish. This is thin gruel, indeed, for our
unfortunate appellate judge. Compounding the injury,
the AO prevents the public from seeing these insipid
documents, just as it refuses to release all judge-
specific information about sentences. By limiting
judicial transparency, the AO's deeply misguided
resorts to secrecy only further the distrust and
disdain that the other branches of government and,
sadly, the public increasingly direct toward the
judiciary.
        Improving the quality and availability of all
sentencing information -- including sentencing opinions
and judge-specific sentencing data -- can yield
numerous benefits. For example, if the court of
appeals has the statistics demonstrating how the
various district courts in its circuit exercise their
sentencing discretion, it will be better able to give
life to the concept of "reasonableness" review.
Complete contextual information coupled with a
meaningful written explanation will allow the appellate
courts to put the sentence into the proper perspective.
Steven L. Chanenson, <u>Write On!</u>, Yale L.J. (The Pocket Part), July
2006, http://www.thepocketpart.org/2006/07/chanenson.html.

        The District of Massachusetts is a shining exception to the
prevailing secrecy about sentencing. By vote of the judges, the
Judgment and Commitment Order in every case in this District is a
public document unless the individual judge shall, for case-
specific reasons, otherwise order. Moreover, my colleague, Judge
Nancy Gertner, is probably the nation's leader in articulating
completely the grounds for her sentences in fully developed

sentencing opinions. _See, e.g._, United States v. Mueffelman, 400
F. Supp. 2d 368 (D. Mass. 2005); United States v. Malouf, 377 F.
Supp. 2d 315 (D. Mass. 2005); United States v. Pineyro, 372 F.
Supp. 2d 133 (D. Mass. 2005); United States v. Pimental, 367 F.
Supp. 2d 143 (D. Mass. 2005). The failure of district judges
explicitly to explain the grounds for their sentencing is drawing
increased criticism.

> What we need to make this system work, however, are
> true sentencing judgments. The Guidelines have changed
> judicial practice in this field. Judges once felt
> empowered just by virtue of their robes to do justice
> in sentencing; now they seem to feel incompetent
> without the Sentencing Manual. That sociology of
> sentencing will need to change if the imposition of
> mandatory Guidelines, as a practice, is ever to be left
> behind. The onus in this respect is on district
> courts, for if the criterion of post-Booker review for
> reasonableness is the well-reasoned-ness of the
> sentence, then sentencing courts will bear the burden
> of showing real, independent, and nuanced consideration
> of all their sentences if they hope for their non-
> Guideline sentences to stand up. If they give
> appropriate reasons then they should be entitled to
> deference, but that means they have to give their
> reasons in sentencing opinions that take time and
> effort to create. Yet if the federal judiciary takes
> up this mantle, and defends its discretion and its
> unique ability to do justice in sentencing, then the
> advisory Guideline system created by Booker can be made
> to work.

Citron, supra note 36.

For my own part, I have tried for 21 years to explain to the
offender and the government the grounds for every single sentence
imposed. I speak from the bench at the time of sentencing and
lay out as cogently as I can precisely those case- and offender-
specific characteristics that have led me to the sentence
imposed. Only once, for the sentencing of Richard Reid, see
United States v. Reid, No. 02-10013 (D. Mass. filed Jan. 16,
2002), have these explanations ever received any notoriety, but
they are delivered at the close of every single sentence. Donald
Womack, this session's official court reporter, see supra note 5,
prepares the transcript of these remarks that same day. They are
attached to the Judgment and Commitment Order and transmitted
electronically to the Sentencing Commission. I am informed that
the Sentencing Commission never reads them. No matter.

What is important is that Mr. Womack has now assembled, in a
fully searchable, publicly available database all 21 years of

The Court opened the sentencing hearing by reciting these various data points. These data are important to this Court's approach to sentencing, as they reflect what actual courts and actual judges (including me) are actually doing in the crucible of actual, specific sentencing decisions. If the judiciary is truly interested in criminal sentences that are generally uniform and deviate from the norm only for case- and offender-specific reasons -- and this Court is -- then these are the crucial data. If the resulting Guidelines range encompasses these data points, the "advice" of the Guidelines is correspondingly stronger; if, as frequently happens, the data points cluster about a range considerably lower than the recommended Guidelines range, then their "advice" is less persuasive to the Court since the overwhelming evidence is that actual offenders receive lesser sentences. In every case since the First Circuit's <u>Jiménez-Beltre</u> decision, of course, this Court accords the Guidelines the deference there commanded.[77]

---

these sentencing data. The database includes the offense(s) of conviction, the date of sentence, the precise sentence imposed, and the reasons therefor. The database may presently be accessed at http://donwomack.com at no charge. Our Court will vote at its September meeting whether to place the entire database on the Court's official website.

[77]<u>Jiménez-Beltre</u> came as no surprise to this Court. Even before that decision, I believe I was acting in scrupulous obedience to Remedial <u>Booker</u>. An appropriate concern for

115

The data points having duly been recited, the Court

proceeded with its Guidelines calculation. At this point, the

central factual dispute -- the drug quantity calculation -- came

to the fore. Kandirakis's counsel argued that, given the jury

finding that the government had failed to prove any drug quantity

beyond a reasonable doubt, this Court must sentence at the lowest

possible drug quantity range (i.e., as if no drug quantity were

proven).

Consistent with the reasoning set out above, this Court

disabused counsel of the supposition that the jury verdict was

controlling on the Court, but at once went on to find that, given

Adelman's suspect credibility, the Court, too, had a reasonable

doubt that the government had proven that any specific drug

quantity or range was attributable to Kandirakis. Argument then

turned to whether the government had proven at trial any specific

drug quantity or range by a preponderance of the evidence -- the

standard of proof this Court felt constrained to apply.[78] The

_____

transparency, however, has required this Court to explain its
procedures in complete detail.

[78]Kandirakis's sentence was imposed after the First
Circuit's commands in Yeje-Cabrera, but before it declared in
Jiménez-Betre that the Guidelines were entitled to substantial
weight, and before the Court realized the potential scope of
Pho's declaration that the Guidelines' policy choices (e.g., the
use of the preponderance standard) were immune from judicial
reconsideration. Since the full and fair implication of these
decisions, taken together, indicates that these "advisory"
Guidelines are functionally near-mandatory, the need for proof
beyond a reasonable doubt may now be constitutionally necessary,
even under Booker. The Court expresses no opinion on this

government argued for a higher quantity, Kandirakis's counsel for a lower one.

It is important to note that, throughout these proceedings, there was not the least hint of vindictiveness against Kandirakis for proceeding to trial. Cf. Green, 346 F. Supp. 2d at 278, 328-30 (secretly "swallowing" the gun in return for a plea). But see Yeje-Cabrera, 430 F.3d at 26-28 (recognizing no vindictiveness in "regurgitating" the gun when the plea deal fell through). Commendably, here, the government's view of the "facts" was entirely consistent throughout the prosecutions of Siciliano, Arco, and Kandirakis. Where the government engaged in fact bargaining (Siciliano), it was candidly acknowledged. Moreover, the government's statement of the conspiracy was the same as to Arco (who pled), as it was for Kandirakis (who went to trial).[79]

After full consideration of the entire trial record, the pre-sentence report, and the able arguments of both counsel, this

---

argument here; it suffices to note that the use of the preponderance standard in Kandirakis's case does not foreclose consideration of these later developments.

[79]Inexplicably, the pre-sentence report for Kandirakis contained an obscure reference to a confidential, undercover source ("CW2") who purportedly could attribute 900 OxyContin pills to Kandirakis. It appears this data came from someone in the government. When this was called to the attention of Assistant United States Attorney Nancy Rue as a possible violation of the Court's order that Guidelines enhancement facts be proved to the jury, she promptly eschewed any reliance on this source.

117

Court found by a fair preponderance of the evidence that 250 OxyContin pills were properly attributable to Kandirakis.

This determination made, the Court could proceed to calculate the suggested Guidelines range. This last act illustrates the pervasive shadow the so-called "advisory" Guidelines continue to cast over federal sentencing today. At the time of Kandirakis's offense, in 2003, the drug quantity Guidelines enhancement was based on the aggregate weight of the OxyContin pill. See USSG § 2D1.1(c), comment (n.(A) & Drug Equivalency Tables) (Nov. 2002) (using a conversion of 1g as equivalent to 500g of marijuana). Applying the then-applicable 2002 Guidelines yielded a Guidelines range of 21-27 months in prison.[80] According to the 2005 Guidelines Manual, in effect at the time of Kandirakis's sentencing, however, the drug quantity was to be figured based on the actual weight of the oxycodone within pills themselves. See USSG § 2D1.1(c), comment (n.(B) & Drug Equivalency Tables) (Nov. 2005) (using a conversion of 1g of oxycodone equivalent to 6700g of marijuana). The range pursuant to the 2005 Guidelines was 51-63 months in prison. Kandirakis's counsel argued that, just as was the case under the mandatory Guidelines, United States v. Cruzado-Laureano, 404 F.3d 470, 488 n.10 (1st Cir. 2005) (citing United States v. Colón-Muñoz, 318

---

[80]This range factors a 2-point reduction into the base offense level for Kandirakis's minor role in the OxyContin conspiracy, USSG § 3B1.2(b), and a criminal history category of "I".

118

F.3d 348, 361 (1st Cir. 2003)), it would violate the Ex Post
Facto Clause of the Fifth Amendment, U.S. Const, art. I, § 9, cl.
3, to use the more recent version.

Of course, were the Guidelines truly "advisory",
Kandirakis's argument would lose much of its force, as the Court
could fashion an individualized sentence based on the best
sociological and penological data known to it at the time of
sentence.  See United States v. Roche, 415 F.3d 614, 619-20 (7th
Cir. 2005) (questioning whether the Ex Post Facto Clause has any
role to play in an advisory Guidelines world).  This Court,
however, is required to give substantial weight to the
Guidelines, Jiménez-Beltre, 440 F.3d at 517, and may not question
even the unexplained policy choices of the Sentencing Commission,
Pho, 433 F.3d at 62.  The doctrine of constitutional avoidance,
see Rust v. Sullivan, 500 U.S. 173, 190-91 (1991), thus comes
fully into play here, and as a matter of prudence, this Court
adopted the Guidelines range suggested by the manual in force at
the time of Kandirakis's offense: 21-27 months.

For all the reasons set forth above[81], after a full and fair trial of these matters, immeasurably aided (but not controlled) by an American jury, this Court sentenced Kandirakis to 2 years in the custody of the United States Attorney General.[82]

## VII. CONCLUSION

Undoubtedly, these will not be the final words on the current state of federal sentencing and the constitutionality of functionally mandatory Guidelines. In reality, though, we have long possessed all the words we will ever need:

---

[81]As in every case, see supra note 76, the Court explained the sentence to the defendant:

I have no doubt that to the outside world you have lived an upstanding life. And I understand your apology to everyone for getting them involved in this.
    You must understand, Mr. Kandirakis, that you have dealt serious drugs. These are not some sort of recreational, the type of drugs used by the good people. These are dangerous, prohibited drugs. And you, sir, are a drug dealer. There are others involved. There are others more seriously involved. You throughout the period of this conspiracy were a wannabe. You wanted to be more involved, you wanted to be more central to serious drug dealing.
    Now, the Court has taken all the circumstances into account. The Court has been slow and thorough. The Court has made precise and careful fact finding. Having done so, it is clear that relative to the other· two co-defendants your involvement is less. That said, you are a guilty felon of serious drug dealing.
United States v. Kandirakis, No. 04-10372 (D. Mass. filed Dec. 15, 2004), Sentencing Hr'g [Doc. No. 69], Tr. at 50.

[82]It is not without some irony that this is, in every respect, a "Guidelines sentence", duly reported to and so recorded by the U.S. Sentencing Commission.

[L]iberties . . . cannot but subsist, so long as this
palladium [trial by jury] remains sacred and inviolate,
not only from all open attacks, (which none will be so
hardy as to make) but also from all secret
machinations, which may sap and undermine it[] by
introducing new and arbitrary methods of trial . . . .
And however convenient these may appear at first, (as
doubtless all arbitrary powers, well executed, are the
most convenient) yet let it again be remembered, that
delays, and little inconveniences in the forms of
justice, are the price that all free nations must pay
for their liberty in more substantial matters; that
these inroads upon this sacred bulwark of the nation
are fundamentally opposite to the spirit of our
constitution; and that, though begun in trifles, the
precedent may gradually increase and spread, to the
utter disuse of juries in questions of the most
momentous concern.

4 Blackstone, supra, at 343-44.  Heeding these words, this Court

will continue to do its part to protect our citizens' voice in

the judiciary.  Will others do the same?

WILLIAM G. YOUNG
DISTRICT JUDGE

121

APPENDIX A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES of AMERICA )
                          ) CRIMINAL ACTION
       v.                 ) NO. 04-10372-WGY
                          )
GEORGE KANDIRAKIS         )

## JURY VERDICT

1.  On the charge of conspiracy to distribute oxycodone,
    we find George Kandirakis

        _____ not guilty

        ___✓___ guilty

2.  If guilty, we find there is reasonably attributable to
    George Kandirakis _____ oxycodone pills.

                          fewer than 5 pills        _____
            at least 5 but fewer than 9 pills       _____
            at least 9 but fewer than 19 pills      _____
            at least 19 but fewer than 37 pills     _____
            at least 37 but fewer than 75 pills     _____
           at least 75 but fewer than 112 pills     _____
          at least 112 but fewer than 149 pills     _____
          at least 149 but fewer than 187 pills     _____
          at least 187 but fewer than 746 pills     _____
        at least 746 but fewer than 1,306 pills     _____
      at least 1,308 but fewer than 1,866 pills     _____
      at least 1,866 but fewer than 5,597 pills     _____

Date: _9/26/2005_

_Nancy Martin_
        Forelady

123

APPENDIX B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
)
v. ) CRIMINAL ACTION
) NO. 03-10201-WGY
ISRAEL BAEZ )
)

## JURY VERDICT

1.  On the distribution charge, we find Israel Baez:

⎯⎯⎯ not guilty

✓ guilty of distribution of ____over___ 100 grams
of heroin on or about May 30, 2003.

2.  On the conspiracy charge, we find Israel Baez:

⎯⎯⎯ not guilty

✓ guilty of conspiracy to distribute ___over___ 100 grams
of heroin on or about May 30, 2003.

_____
Stanley Vong
Foreman

Date: ___2/24/04___

125

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


UNITED STATES )
              )
      v.      ) CRIMINAL ACTION NO. 03-10377-WGY
              )
ERIC LINO     )


JURY VERDICT

1.  On the distribution charge, we find Eric Lino

    _____ not guilty

    ___✓___ guilty of distribution of ___55·2 grams___ cocaine

2.  On the conspiracy charge, we find Eric Lino

    _____ not guilty
       ✓
    _____ guilty of conspiracy to distribute cocaine.


    In this conspiracy

        a.   _____ is properly attributable to

             Eric Lino

        b.   _____✓_____ at least 3.5 kilograms but less

             than 5 kilograms

        c.   _____ at least 2 kilograms but less

             than 3.5 kilograms

        d.   _____ at least 500 grams but less than

             2 kilograms

        e.   _____ at least 400 grams but less than

             500 grams

126

      f.     _____ at least 300 grams but less than

            400 grams

      g.     _____ at least 200 grams but less than

            300 grams

      h.     _____ *at least 100 grams but less than 200 grams* ✓✓

3. As to the forfeiture claim, we find that the following items
   are to be forfeited:

    a.  ___ No  ✓ Yes    A 2000 Cadillac Escalade, bearing
                                   Massachusetts registration No.
                                   19EK03, registered in the name of
                                   Gerard Senac

    b.  ✓ No  ___ Yes    One Yamaha Waverunner jet ski,
                                     #GP800X and GP80824030

    c.  ✓ No  ___ Yes    One Yamaha Waverunner jet ski
                                     (With jet ski trailer, MA Reg.
                                     900562), #GP1200X and GU00806444

_hauen Kelly_
_____
Forelady

Date: _Nov. 23rd, 2004_

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                            )
    v.                      )    CRIMINAL ACTION
                            )    NO. 03-10362-WGY
TREVOR ROYCE TEAGUE         )
FABIAN A. RUIZ,             )
            Defendants.     )

## JURY VERDICT

1.  On the charge of possession of marijuana with intent to
    distribute, or aiding and abetting such possession, we
    find Trevor Teague

    _____  not guilty

    __X__  guilty of possession of

            _____  marijuana

                __X__  at least 100 but less than 400 kilograms
                       of marijuana

                _____  at least 80 but less than 100 kilograms
                        of marijuana

                _____  at least 60 but less than 80 kilograms
                        of marijuana

2.  On the charge of conspiracy to possess marijuana with intent
    to distribute, we find Trevor Teague

    _____  not guilty

    __X__  guilty of conspiracy to possess

            _____  marijuana

128

___X___ at least 100 but less than 400 kilograms
of marijuana

_____ at least 80 but less than 100 kilograms
of marijuana

_____ at least 60 but less than 80 kilograms
of marijuana

3.  On the charge of possession of marijuana with intent to
    distribute, or aiding and abetting such possession, we find
    Fabian A. Ruiz

_____ not guilty

___X___ guilty of possession of

_____ marijuana

___X___ at least 100 but less than 400 kilograms
of marijuana

_____ at least 80 but less than 100 kilograms
of marijuana

_____ at least 60 but less than 80 kilograms
of marijuana

4.  On the charge of conspiracy to possess marijuana with intent
    to distribute, we find Fabian A. Ruiz

_____ not guilty

___X___ guilty of conspiracy to possess

_____ marijuana

___X___ at least 100 but less than 400 kilograms
of marijuana

_____ at least 80 but less than 100 kilograms
of marijuana

_____ at least 60 but less than 80 kilograms
of marijuana

129

5.    Was Fabian A. Ruiz an organizer, leader, manager, or
      supervisor of this criminal activity?

            ✗ no              _____ yes

                                        _____
                                                   Foreman

Date:    2·3·05

130

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA    )
                            )
    v.                      )    CRIMINAL ACTION
                            )    NO. 04-10200-WGY
JOHNNIE MARTIN,             )
        Defendant.          )


### JURY VERDICT


We find Johnnie Martin

    ___✓___    not guilty

    _____    guilty of distribution of

                _____    cocaine base

                _____    at least 5 but less than 20 grams
                                 of cocaine base


                        Joanne K. Hearey
                            Forelady


Date:    2/11/05


131

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES of AMERICA              )
                                      )
        v.                            )
                                      ) CRIMINAL ACTION No. 04-10098-WGY
CARMEN FIGUEROA and                   )
WILLIAM TEJEDA,                       )
                Defendants.)

## JURY VERDICT

We find Carmen Figueroa

_____  not guilty

___✓___  guilty of conspiracy to possess with intent to distribute

                                    _____ of cocaine base.
                    more than 1.5k  _____✓_____ of cocaine base.
    at least 500g but less than 1.5k _____ of cocaine base.
    at least 150g but less than 500g _____ of cocaine base.
    at least 50g but less than 150g  _____ of cocaine base.

We find William Tejeda

_____  not guilty

___✓___  guilty of conspiracy to possess with intent to distribute

                                    _____ of cocaine base.
                    more than 1.5k  _____✓_____ of cocaine base.
    at least 500g but less than 1.5k _____ of cocaine base.
    at least 150g but less than 500g _____ of cocaine base.
    at least 50g but less than 150g  _____ of cocaine base.

                        _____
                                    Forelady

Date: ____5-19-2005____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES of AMERICA )
                         )
        v.               )   CRIMINAL ACTION
                         )   NO.  04-10319-WGY
NOEL HERNANDEZ,          )
            Defendant.)

## JURY VERDICT

1.  On the charge of importation of heroin, we find
    Noel Hernandez

    _____ not guilty        ✓  guilty

2.  On the charge of conspiracy to import heroin, we find
    Noel Hernandez

    _____ not guilty        ✓  guilty

3.  There is attributable to Noel Hernandez

    _874 grams___ of heroin

    _____ at least 700 grams but less than 1 kilogram

    _____ at least 400 grams but less than 700 grams

    _____ at least 100 grams but less than 400 grams

    _____ at least 80 grams but less than 100 grams

    _____ at least 60 grams but less than 80 grams

    _____ at least 40 grams but less than 60 grams

    _____ at least 20 grams but less than 40 grams

    _____ at least 10 grams but less than 20 grams

    _____ at least 5 grams but less than 10 grams

    _____ Less than 5 grams

133

4.   Was Noel Hernandez an organizer and manager of a criminal
     enterprise involving less than 5 people?

     _____ no          ✓   yes

*Catherine A. Bacchini*
Forelady

Date: *July 27, 2005*

2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
UNITED STATES OF AMERICA            )
                                    )
         v.                         )  CRIMINAL ACTION
                                    )  NO. 05-10175-WGY
NADINE J. GRIFFIN,                  )
          Defendant.                )
                                    )
```

### JURY VERDICT

    1.    On the charge of filing a false tax return, we find
Nadine Griffin:

        a.   As to the 1998 return:

            _____ not guilty

            _____ guilty

        b.   As to the 1999 return:

            _____ not guilty

            ✓ guilty

2. Were sophisticated means of concealment used?

_____ no

___✓___ yes

3. The amount of the aggregate tax loss is $_____.

_____ more than $200,000

_____ more than $80,000, but less than $200,000

___✓___ more than $30,000, but less than $80,000

_____ more than $12,500, but less than $30,000

_____ more than $5,000, but less than $12,500

_____ more than $2,000, but less than $5,000

_____ $2,000 or less

_Laure Houk_
FORELADY

DATE: 7/24/06

2
136